# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 10, 2004      Decided May 6, 2005

No. 03-3122

United States of America,
Appellee

v.

Antwain L. Dykes,
Appellant

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00431-01)

*Billy L. Ponds* argued the cause and filed the briefs for appellant.

*SuzAnne C. Nyland*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *John R. Fisher*, *Roy W. McLeese, III*, *Steven B. Snyder*, and *John P. Gidez*, Assistant U.S. Attorneys.

Before: ROGERS, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   After a trial by jury, Antwain Dykes was found guilty of possession with intent to distribute cocaine base, possession of a firearm during a drug trafficking offense, and possession of marijuana.   He challenges his convictions on two grounds.   First, Dykes appeals the district court's denial of his motion to suppress drugs and a firearm that the police found on his person in the course of a *Terry* stop. Second, Dykes challenges the sufficiency of the evidence supporting his conviction for possession of marijuana that the police found in a subsequent search of his apartment.   We reject both arguments and affirm the convictions.

I

On the evening of July 30, 2002, three unmarked cars of the Metropolitan Police Department (MPD) pulled into a parking lot at 2408 Elvans Road, S.E., Washington, D.C., in response to complaints of illegal drug trafficking in the area.   Several people were standing nearby, among them Dykes and Theodore Duncan, who were next to each other.   When the police entered the parking lot, Duncan threw an object -- later determined to be narcotics -- to the ground and ran away.   As Duncan fled, Dykes began to walk away from the police cars.

The police then got out of their cars.   Each officer wore multiple items of identification -- either MPD raid jackets and medallions, or badges and orange MPD emblems.   Upon looking back and seeing the officers leave their vehicles, Dykes began to run away at a fast pace.   After Dykes had run twenty to thirty feet, Investigator Jeff Folts forced him to the ground.

Once on the ground, Dykes immediately lay on his stomach with his hands positioned underneath him, near his waistband. Concerned that Dykes might have a weapon, Officer Eric Schuler repeatedly ordered him to show his hands, but he did not

comply. Officers pulled on Dykes' arms to remove his hands from beneath his body. After thirty to forty seconds, the officers succeeded in extracting Dykes' hands, at which point they handcuffed him. When the officers rolled Dykes over and sat him up, they immediately saw a pistol in his waistband. They seized the pistol, placed Dykes under arrest, and searched his person. In his pockets were a ziplock bag of marijuana and thirteen ziplock bags of cocaine base. Dykes admitted to the police that he had been smoking marijuana when they arrived, and that he had had the gun for years.

On August 8, 2002, MPD officers executed a search warrant at Dykes' apartment, close to the parking lot that had been the site of his arrest. Dykes' mother and several of his brothers were present, but Dykes was not. The police later testified that Dykes' mother told them that the first bedroom was Dykes' and that no one else lived in it. 5/15/03 Tr. at 149. According to the police, she further said that "he doesn't like anyone in his room when he's not there, so nobody else stays in the room but him," and that "if anything was in there, . . . it was his." *Id.* At trial, however, Dykes' mother testified that Dykes shared the bedroom with two of his brothers, and that she had told this to the police at the time of the search. Dykes' girlfriend likewise testified that Dykes shared the bedroom with his brothers.

On the floor of the bedroom, the police found a shoe box containing cocaine base and a digital scale with cocaine residue. In the bedroom closet was a tin can containing marijuana. Also in the bedroom were a shotgun shell and small-caliber ammunition. Inside a bedroom cabinet, the police found personal papers bearing Dykes' name and address, including court papers dated July 31, 2002.

Dykes was indicted on four counts of violating federal law. For the drugs and pistol found on his person on July 30, 2002,

Dykes was charged with unlawful possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possession of a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). For the drugs found in the bedroom on August 8, 2002, Dykes was charged with unlawful possession with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii), and possession of marijuana, in violation of 21 U.S.C. § 844(a).

Dykes filed a motion to suppress the drugs and gun found on his person, which the district court denied. Thereafter, a jury found Dykes guilty on all counts except the charge relating to the cocaine base found in the bedroom. On appeal, he challenges both the denial of his motion to suppress, and the sufficiency of the evidence supporting his conviction for possession of the marijuana found in the bedroom.

II

Dykes contends that the police violated the Fourth Amendment's prohibition of unreasonable searches and seizures when they forced him to the ground and handcuffed him. The stop was unconstitutional, Dykes argues, because at the time it was made, the police lacked probable cause to believe that he had committed a crime. In *Terry v. Ohio*, 392 U.S. 1 (1968), however, the Supreme Court held that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). The Court further held that, incident to such a stop, the police may conduct a "protective search for weapons" if they "possess[] an articulable suspicion that an individual is armed and dangerous." *Michigan v. Long*,

463 U.S. 1032, 1034 (1983) (citing *Terry*, 392 U.S. at 24). We decide de novo whether the police had reasonable suspicion; we review the district court's "findings of historical fact only for clear error" and give "due weight to inferences drawn from those facts" and to the court's determinations of witness credibility. *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996); *see United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003).

There is no question but that the officers had reasonable suspicion to stop Dykes. In *Illinois v. Wardlow*, 528 U.S. 119 (2000), the Supreme Court found reasonable suspicion to conduct a *Terry* stop where a person fled without provocation upon seeing police enter an area "known for heavy narcotics trafficking." *Id.* at 124-25. The situation here is nearly identical. Officer Schuler's uncontradicted testimony at the suppression hearing established that Dykes was stopped in an area "known for the sales of cocaine and marijuana," Suppression Hr'g Tr. at 16, that the police had entered the area "due to numerous complaints of illegal narcotics sales," *id.* at 6, and that Dykes fled immediately upon seeing the officers leave their cars. If anything, there was even greater reason for suspicion in this case than in *Wardlow*, because Duncan, the person standing next to Dykes, also fled (and threw down an object) upon seeing the police.

Dykes protests that, even if the officers had reasonable suspicion, the nature of the seizure -- in which he was forced to the ground and ultimately handcuffed -- went beyond the permissible scope of a *Terry* stop. The Supreme Court has "recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In deciding what degree of force is permissible, courts must look to "the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The test is one of reasonableness. *Id.*

Here, the officers used force in two ways, each of which was reasonable. First, because Dykes was in full flight from officers who were justified in stopping him, tackling him[1] was a reasonable method of effectuating the stop. *See United States v. Laing*, 889 F.2d 281, 283, 286 (D.C. Cir. 1989) (holding that it was reasonable for police to force to the floor a suspect who began running upon seeing them).[2] Second, once they had brought him to the ground, it was also reasonable for the officers to remove Dykes' hands from underneath his body and to place him in handcuffs. Dykes had kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view. Under these circumstances, it was reasonable for the officers to fear that Dykes had a weapon in his waistband, and to take the necessary steps to ensure that he could not use it. As the Supreme Court said in *Terry*:

---

[1]Although there was conflicting testimony as to whether Investigator Folts tackled Dykes or merely collided with him, the district court concluded that it was the former. Suppression Hr'g Tr. at 57. Because that conclusion was not clearly erroneous, we proceed upon it here.

[2]*See also United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) (upholding *Terry* stop effectuated by a tackle); *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (same); *United States v. Jackson*, 175 F.3d 600, 602 (8th Cir. 1999) (same); *United States v. Weaver*, 8 F.3d 1240, 1244-45 (7th Cir. 1993) (same).

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24. And as this court said in *Laing*, the "amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight." 889 F.2d at 285.[3]

## III

Dykes' remaining challenge is to the sufficiency of the evidence supporting his conviction for possession of the marijuana found in the search of the bedroom. Our review here is limited: We must accept the jury's guilty verdict if we conclude that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility,

---

[3]*See also Laing*, 889 F.2d at 283, 286 (holding that, during a *Terry* stop, it was reasonable for the police to force a suspect's hand from his pants); *United States v. Jones*, 973 F.2d 928, 931 (D.C. Cir. 1992) (holding that a "*Terry* stop does not turn into a full arrest merely because the officers use handcuffs and force the suspect to lie down to prevent flight, so long as the police conduct is reasonable").

weigh the evidence and draw justifiable inferences of fact." *United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986) (internal citation and quotation omitted).

As we explained in *United States v. Morris*, a case remarkably similar to this one, possession "can be either actual or constructive." 977 F.2d 617, 619 (D.C. Cir. 1992); *see United States v. Hernandez*, 780 F.2d 113, 116 (D.C. Cir. 1986). Constructive possession "requires evidence supporting the conclusion that the defendant had the ability to exercise knowing 'dominion and control' over the items in question." *Morris*, 977 F.2d at 619 (quoting *Hernandez*, 780 F.2d at 116). And a "jury is entitled to infer that a person exercises constructive possession over items found in his home." *Id.* at 620; *see United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991).

There was ample evidence that Dykes lived in the apartment that the police searched, and specifically in the bedroom where they found the marijuana. As to the apartment, Dykes' name was on the lease. As to the bedroom, personal papers bearing his name and address, including court papers dated July 31, 2002, were found inside a bedroom cabinet. *See Morris*, 977 F.2d at 619-20 (noting that the presence of a birthday card with the defendant's name, found inside a dresser drawer, was evidence that the defendant lived in the apartment). Further, the police testified that, when they asked which bedroom was Dykes', his mother directed them to the bedroom in question. Hence, because there was sufficient evidence to infer that the bedroom was his, "the jury could infer that he constructively possessed the drugs." *Id.* at 620.

Dykes counters that there was evidence that he shared the bedroom with his brothers. We have previously recognized that "[t]he inference that a person who occupies an apartment has

dominion and control over its contents applies even when that person shares the premises with others," although it is plainly not as strong an inference in that circumstance. *Id.* at 620; *see United States v. Edelin*, 996 F.2d 1238, 1241 (D.C. Cir. 1993); *Jenkins*, 928 F.2d at 1179. In any event, there was sufficient evidence in this case for a reasonable juror to conclude that Dykes did not share the bedroom. Officer Anthony Greene testified that Dykes' mother told him that Dykes alone occupied the bedroom, and that all the items in the bedroom were his. The two officers who searched the bedroom testified that the room -- which contained only a single bed -- appeared to have only one occupant. In addition, the only personal papers found in the room had Dykes' name on them. And while Dykes' mother and girlfriend testified that Dykes shared the bedroom with his brothers,[4] the jurors may not have believed them, particularly in light of Officer Greene's testimony that the mother had made a contrary statement to him. *See Morris*, 977 F.2d at 620 (noting that jurors were permitted to credit the testimony of officers who testified that the defendant had said he lived in the apartment at issue, despite the defendant's trial testimony to the contrary). Thus, there was sufficient "evidence from which the jury could infer that [Dykes] lived alone in the [bedroom] and exercised constructive possession over its contents." *Id.* at 620. Moreover, Dykes had been arrested nearby -- just the week before -- in possession of the same drug, which was further evidence that he possessed the marijuana in the bedroom.[5]

---

[4]On appeal, Dykes contends that his mother's testimony was supported by Investigator Anthony Commodore's statement that there was clothing of different sizes in the bedroom closet. But Investigator Commodore did not so testify. *See* 5/14/03 Tr. at 140-41.

[5]*See United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002) (holding, in a constructive possession case, that "where a defendant is

Finally, Dykes questions how the jury could have acquitted him on the charge of possessing the cocaine base found in the bedroom, but convicted him of possessing the marijuana found in the same room. We do not know what went through the jurors' minds. Perhaps they were persuaded by defense counsel's argument that the cocaine base found in the bedroom could not have been Dykes' because it was of a different purity than that of the drugs found on his person at the time of his arrest. Or perhaps the verdicts were simply inconsistent. But even if the latter were so, a "criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count." *United States v. Powell*, 469 U.S. 57, 58 (1984); *see id.* at 66; *Laing*, 889 F.2d at 288. As Oliver Wendell Holmes, quoting Learned Hand, said for the Court in *Dunn v. United States*:

> The most that can be said in such [a] case[] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

---

charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to his knowledge and intent with regard to the crime charged" (internal quotation mark omitted)); *Unites States v. Toms*, 136 F.3d 176, 183-84 (D.C. Cir. 1998) (holding that a driver's conviction for constructive possession of a gun found in the car was supported by evidence of prior gun possession).

284 U.S. 390, 393 (1932) (quoting *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir. 1925)); *see Powell*, 469 U.S. at 64-65 (quoting *Dunn* with approval).

The proscription against reviewing the inconsistency of verdicts does not leave the defendant bereft of "protection against jury irrationality or error." *Powell*, 469 U.S. at 67. Rather, that protection is afforded "by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Id.* We have undertaken such a review, and for the reasons stated in this Part, we conclude that the evidence was sufficient to support Dykes' conviction for possession of the marijuana found in the bedroom.

IV

The officers' stop of Dykes and subsequent seizure of narcotics and a firearm from his person were lawful under the Fourth Amendment. In addition, the evidence that he possessed the marijuana found in the bedroom was sufficient to support his conviction for that crime. Accordingly, the defendant's convictions are

*Affirmed.*