# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 7, 2005        Decided December 13, 2005

No. 04-3063

UNITED STATES OF AMERICA,
APPELLEE

v.

ROSEMARY E. GOMEZ,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 90cr00189-01)

---

*Paul Y. Kiyonaga* argued the cause and filed the briefs for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, Assistant U.S. Attorney at the time the brief was filed, and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorney.

Before: ROGERS and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

2

WILLIAMS, *Senior Circuit Judge*: Rosemary Gomez was convicted of four counts involving distribution of, or possession with intent to distribute, cocaine base (in this case, crack cocaine), plus one count of failure to appear before a court as required by conditions of release, see 18 U.S.C. §§ 3146(a)(1) and 3146(b)(1)(A)(i). Under counts three and four, conviction-- and the substantive issue before us--required involvement with five or more grams of crack, see 21 U.S.C. §§ 841(a)(1); 841(b)(1)(B)(iii); 860(a), and in practice turned on whether the government showed Gomez to have been in constructive possession of a substantial stash of crack located in the closet of the apartment where she was arrested.

Here, Gomez argues that there was insufficient evidence for a rational jury to find that she possessed more than five grams of crack, and she accordingly asks this court to set aside the convictions premised on that amount. We reject Gomez's argument and affirm those convictions. She also contends that her sentence constitutes plain error in light of *United States v. Booker*, 125 S. Ct. 738 (2005). We agree and therefore vacate the sentence and remand for resentencing.

\* \* \*

As always with a defendant's claims of insufficient evidence, we review de novo, viewing the evidence in the light most favorable to the government. We affirm if a rational fact-finder could have found guilt beyond a reasonable doubt. *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002).

According to the government's evidence, Officer Best of the Metropolitan Police Department ("MPD"), acting undercover, knocked at the door of a D.C. apartment at about 8:30 on a spring evening in 1990. The door opened, and inside

Best saw Gomez, as well as two men, Pena and Medina. Best held out two $20 bills and one $10 bill. He asked for "two twenties," meaning, as he later testified, two $20 rocks of crack cocaine. In response, Pena said, "mira, mira" (look, look), at which point Gomez walked toward Best and reached into her bra to pull out a plastic bag. From the bag, Gomez handed Best two rocks of crack, and Best gave her the two $20 bills. Medina then asked Best to buy yet another rock. Best handed the $10 bill to Medina, at which point Gomez reached into her plastic bag again and gave Best another rock of crack. Best then left the apartment.

Five or ten minutes later, several MPD officers announced themselves at the door of the apartment and, receiving no answer, forced their way in. Gomez ran out of the front room and into the bedroom, where she threw down a purse she had been carrying. The purse contained the three bills, totaling $50, that Best had used minutes earlier to make his purchase, plus another $283 in cash. Officer Lawrence searched Gomez and found that her bra contained a plastic bag, which, in turn, contained three rocks of crack.

The crack that Gomez sold to Best, plus the amount Lawrence recovered from the plastic bag on her person, came to less than five grams. The government presented no other evidence of Gomez's *actual* possession of crack. But in searching the apartment the officers discovered, on the floor of the bedroom closet, a second plastic bag of crack, containing well over five grams. (Also in the closet were a boot and a film canister that each contained small amounts of crack.) The key question is whether the evidence supports the government's claim that Gomez was in constructive possession of the stash in the plastic bag on the closet floor.

4

Conviction on the basis of constructive possession requires evidence of the defendant's "ability to exercise knowing dominion and control over the items in question." *Wahl*, 290 F.3d at 376 (citations and internal quotation marks omitted). Where drugs are found in a place occupied by more than one person, the evidence must support a belief that "the accused had a substantial voice vis-à-vis" the drugs, *United States v. Staten*, 581 F.2d 878, 884 (D.C. Cir. 1978), or, equivalently, "some appreciable ability to guide [the drugs'] destiny," *id.* at 883. Of special relevance here, a defendant's "proximity to contraband, combined with evidence linking the accused to an ongoing criminal operation of which . . . possession of the contraband is a part, may support a finding of constructive possession." *In re Sealed Case*, 105 F.3d 1460, 1464 (D.C. Cir. 1997) (citations, internal quotation marks, and brackets omitted). While some of our cases hold that constructive possession may be proven by types of evidence other than *Sealed Case*'s combination of proximity to contraband and a link to a criminal operation, e.g., *United States v. Richardson*, 161 F.3d 728, 732 (D.C. Cir. 1998), no such case purports to establish an exclusive test.

Here the evidence showed both features mentioned in *Sealed Case*. First, there was close proximity between Gomez and the closet stash: the apartment was small, consisting of only a combined living room/kitchen, a bedroom, a hallway, and a bathroom. Second, there was evidence to link Gomez to the broader operation. The government presented overwhelming evidence that Gomez sold the kind of drug of which the stash consisted, and did so in the very apartment where the stash was located and in the presence of confederates. It also offered evidence suggesting reason to believe that what she sold may have come from the stash itself. The government's expert testified that the stash included one large rock and that crack dealers commonly chip small pieces from such a large rock in order to make sales. The jury could rationally draw a link

between this testimony and the small rocks that Gomez kept on her person.  Gomez's actual possession of $333 further suggests involvement in a larger enterprise.  Finally, besides the natural inferences from Gomez's apparently feeling comfortable selling crack in the apartment in the presence of other occupant-confederates, there was evidence that her link to the apartment was more than casual. The officers found ten photographs of Gomez on top of the stereo in the living room (although they were not framed and there was no evidence that they were taken in the apartment).

Gomez draws our attention to the facts of *Staten*, in which we upheld a finding that the defendant, whom police discovered in an apartment, constructively possessed all drugs in the apartment, even though many of them were tucked away in an envelope atop a kitchen cabinet, in the pockets of coats hanging in a closet, and in a plastic bottle on a closet shelf.  581 F.2d at 881.  Gomez contends that the evidence in her case is weaker than in *Staten*.  That may be so in some respects, especially the defendant's connection to the apartment: Staten had a key (but to only one of the two entrance locks) and had left his ID on a closet shelf (though it was unclear whether this was the shelf on which drugs were sitting).  *Id*. at 881 & n.27, 885.  But the direct evidence of Staten's participation in a related drug-dealing enterprise seems weaker than for Gomez.  Staten had on his person $165 and a distribution quantity of heroin, though heroin was only one of three types of drugs found in the apartment.  *Id*. at 881-82, 883.  He made no sale in the apartment, much less a sale in the presence of others.

Another case upholding conviction, *United States v. Thorne*, 997 F.2d 1504 (D.C. Cir. 1993), relates to our facts the same way (stronger on the defendant's link to the place, weaker on the link to a criminal enterprise).  There we upheld a finding that defendant Ian Thorne constructively possessed a stash of crack

in a bag on the floor of a house's bedroom closet.  Thorne lived in the room part of the time, though apparently sharing it with several others.  *Id*. at 1507 n.4, 1510, 1511-12.  But Thorne's link to crack-dealing was not as tight as Gomez's.  From the front steps of the house he was seen speaking with one Haynes, who then walked to a nearby park and sold crack to an undercover officer; soon afterward Thorne pointed someone in the direction of that park.  *Id.* at 1507, 1511-12.  Thorne owned a beeper and had on him $190.  *Id.*

Apart from *Staten*, Gomez relies particularly on three cases, each of which is either distinguishable or irrelevant.  The first is *United States v. Foster*, 783 F.2d 1087 (D.C. Cir. 1986), in which we invalidated a finding of constructive possession where the "only evidence . . . to link the appellant to the shotgun was testimony that the appellant was near the location of the shotgun [i.e., behind a store counter] just prior to its being discovered, that he was in that location for an unspecified amount of time once a week, and that he had another gun on his person." *Id*. at 1089.  *Foster* emphasized that the defendant's possession of the other gun was not shown to be unlawful and therefore (in contrast to Gomez's crack dealing) showed no link to a criminal enterprise.  *Id*. at 1090-91.

The second is *Sealed Case*, in which we rejected a finding of constructive possession of a gun--a finding that would have disqualified defendant for the "safety valve" available to drug offenders of little culpability.  105 F.3d at 1463-65.  The defendant sat in a restaurant for the duration of a drug deal, while his co-conspirator conducted the actual exchange outside the restaurant; the gun remained under the driver's seat of the co-conspirator's car the whole time.  *Id*. at 1461.  There was no evidence that the defendant traveled to the restaurant in his co-conspirator's car, *id*. at 1465, nor apparently that he entered the car afterward, given that the two men were arrested as soon as

the sale was over, *id*. at 1461. The opinion emphasized two factors distinct from Gomez's case: (1) there was nothing to suggest that the defendant was "anywhere near the gun immediately prior to the sale"; and (2) the government was trying to use a defendant's participation in drug distribution to support constructive possession *not* of a drug, but of a gun, which we said it couldn't do without more evidence. *Id.* at 1464, 1464-65.

Finally, Gomez invokes *United States v. Jenkins*, 981 F.2d 1281 (D.C. Cir. 1992), but mainly to refute the government's assertion that Gomez's flight in the direction of the bedroom closet indicated her knowledge of the location of the stash—an assertion on which we don't rely.

Accordingly, we find the evidence sufficient to support the challenged convictions.

\* \* \*

The district court, sentencing Gomez in April 2004, treated the U.S. Sentencing Guidelines as mandatory. In January 2005 the Supreme Court held in *Booker* that under the Sixth Amendment "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S. Ct. at 756. As a remedy the Court effectively nullified the U.S. Code provisions that rendered the Guidelines mandatory. *Id*. at 764.

Gomez now asks us to vacate her sentence as a violation of *Booker* and to remand for resentencing. Because she didn't raise this issue below, we review her claim for plain error under Federal Rule of Criminal Procedure 52(b). Under this rule,

"there must be (1) error, (2) that is plain, and (3) that affects substantial rights"; if "all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Coles*, 403 F.3d 764, 767 (D.C. Cir. 2005) (citations, internal quotation marks, and brackets omitted). Under *Coles*, any case where a district court has sentenced a defendant under the assumption that the Guidelines are mandatory meets the first and second conditions automatically and meets the fourth whenever the third--prejudice to substantial rights--exists. *Id*. Here, then, the only question is whether Gomez's sentence fulfills the third condition, i.e., whether the error "affects substantial rights."

Long before *Booker*, we held that an appellant seeking to show that an error in the sentencing context has "affect[ed] substantial rights" must demonstrate "a reasonable likelihood that the sentencing court's obvious errors affected his sentence." *United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994); see also *United States v. Williams*, 358 F.3d 956, 966 (D.C. Cir. 2004); cf. *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2340 (2004) ("a defendant who seeks reversal of his conviction after a guilty plea, on the ground that the district court committed plain error under [Federal Rule of Criminal Procedure] 11, must show a reasonable probability that, but for the error, he would not have entered the plea"). The standard of "reasonable likelihood" is somewhat more relaxed in the area of sentencing than it is for trial errors, since "a resentencing is nowhere near as costly or as chancy an event as a trial." *Saro*, 24 F.3d at 288; see also *Williams*, 358 F.3d at 966.

In deciding whether the appellant fulfilled the third condition of the plain-error test, *Coles* did not discuss the *Saro* standard of "reasonable likelihood." *Coles*, 403 F.3d at 767-71. Instead, *Coles* stated that there would be some cases in which

the appellate court would be "confident" that the sentence would not have been lower even if the district judge had known the Guidelines were advisory, in which case the sentence should be affirmed. *Id*. at 769 (citing *United States v. Smith*, 401 F.3d 497, 499 (D.C. Cir. 2005)). *Coles* added that there would also be cases in which the appellate court would be "confident" that the sentence would have been lower, e.g., if the district judge "indicated on the record that, but for the Guidelines, she would have imposed a lower sentence." 403 F.3d at 769. (The opinion did not explicitly say what should be done in such cases, but a full resentencing remand is surely implied.) As to the case before it, *Coles* concluded that the record was not "sufficient" for it to "determine prejudice with any confidence." *Id*. It therefore remanded the record to the district court "for the limited purpose of allowing it to determine whether it would have imposed a different sentence, materially more favorable to the defendant, had it been fully aware of the post-*Booker* sentencing regime." *Id*. at 771. As to the procedure of this limited remand, we adopted the Seventh Circuit's view in *United States v. Paladino*, 401 F.3d 471, 484 (7th Cir. 2005), that the defendant's presence was unnecessary but that the district judge should obtain the views of counsel on both sides. *Coles*, 403 F.3d at 770. If the district judge concluded that she would have given a lower sentence, the appellate court would then vacate the sentence, *id*., clearing the way for full resentencing.

Nothing *Coles* said appeared to displace our standard rule that a defendant is entitled to a sentencing remand on a showing of a "reasonable likelihood" that the sentence would be lower absent the trial court's plain error. A case could be made, however, that the device *Coles* created, a purely informational remand of the record, represents a useful innovation that could replace a full sentencing remand in those cases where, though there is a "reasonable likelihood" of a lower sentence with

correction of the *Booker* error, the appellate court isn't "confident" of such a reduction.

Even apart from the demands of *stare decisis*, *LaShawn A. v. Barry*, 87 F.3d 1389, 1393, 1395 (D.C. Cir. 1996) (en banc), however, we believe that a full resentencing remand continues to be preferable where there is a "reasonable likelihood" of a sentence reduction. The alternative approach, using a *Coles* remand both in cases where the chance of a reduction is simply unknown, *and* in cases where a reduction is "reasonably likely," will sometimes, when viewed *ex post*, prove more speedy and efficient--namely, in those instances where the district court ultimately makes clear its intent to keep the sentence unchanged. In all other instances, viewed *ex post*, preserving the standard "reasonable likelihood" remand will be more speedy and efficient, because the district court will turn straight to lowering the sentence in one proceeding without any intermediate trip to the district court, back to the court of appeals, and back to the district court. Of course we cannot know the ultimate outcomes *ex ante*, so we have to apply a rule that seems on balance the most effective and fair to the parties. We think, in the end, that enough of the "reasonable likelihood" cases will in fact generate a sentence reduction to make that approach preferable overall.

A further advantage of adhering to the standard "reasonable likelihood" remand is that it reduces the risk of a wrongful extension of a defendant's prison time where the ultimate lowered sentence would have been completed before completion of the process of limited and then full remand.

We take a moment to consider the practice of the three other circuits that have adopted a limited-remand procedure for *Booker* error. *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc); *Paladino*, 401 F.3d at 483-84; *United*

*States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The Ninth Circuit has said that "reasonable probability" is the standard for showing prejudice in *Booker* plain-error cases, *Ameline*, 409 F.3d at 1078, but its reported *Booker*-remedy cases seem to remand for full resentencing only when the appellate court "can reliably determine from the record that the sentence imposed would have differed materially." *United States v. Labrada-Bustamante*, No. 04-30082, slip op. at 15274 (9th Cir. Nov. 10, 2005). The Seventh Circuit's standard for whether to grant such a remand is clearly higher than "reasonable likelihood"; it says that the "normal remedy in this circuit for [*Booker* error] is a limited remand," but "[w]e can skip the limited remand if we are *highly confident* that the judge would have imposed a different sentence." *United States v. Pittman*, 411 F.3d 813, 817-18 (7th Cir. 2005) (emphasis added). In only one reported case, where the district court had been quite explicit in the initial sentencing about its intent if freed of the Guidelines, has an appellant passed this test. *United States v. Coney*, 407 F.3d 871, 876 (7th Cir. 2005). The Second Circuit sets forth no explicit standard for showing prejudice in *Booker* plain-error cases, *Crosby*; see also *United States v. Williams*, 399 F.3d 450 (2d Cir. 2005), and its reported *Booker*-remedy cases have never seriously considered granting an immediate remand for full resentencing, perhaps because appellants have not pressed the argument.[1] To the extent that our approach departs from these circuits', we do

---

[1] The Ninth Circuit remands for full resentencing in a case where the original district judge is unavailable. *United States v. Sanders*, 421 F.3d 1044, 1052 (9th Cir. 2005). See also *United States v. Garcia*, 413 F.3d 201, 231-32 (2d Cir. 2005) (Calabresi, J., concurring) (arguing, in a case where the original district judge was unavailable, that the remand procedure fashioned by the majority was functionally equivalent to a remand for full resentencing, contrary to the majority's assertion).

so for the reasons of *stare decisis* and judicial economy explained above.

To summarize, in a *Booker* plain-error case: (1) if the record establishes a reasonable likelihood that the sentence would have been lower, we remand for full resentencing; (2) if the record makes us confident that the sentence would not have been lower, we affirm; and (3) if neither of the above, we grant a limited remand.

In the present case, the record establishes a reasonable likelihood that the district judge would have given Gomez a lower sentence had he known that the Guidelines were not mandatory.

As is typical under the Guidelines, the sentencing was quite complex. The amount of crack involved in each of the four drug offenses yielded an offense level of 26, see U.S.S.G. § 2D1.1(c)(9);[2] for two counts (two and four), the fact that Gomez's activities were within 1000 feet of a school, see 21 U.S.C. § 860(a), increased the level by two, U.S.S.G. § 2D1.2(a)(1), bringing it up to 28. The district court evidently applied the Guidelines' grouping provisions and used the level for the worst offense in the group, i.e., 28, as a combined offense level. See *id*. §§ 3D1.1-5. From this, the court subtracted two on the ground that Gomez was a minor participant in the crime. *Id*. § 3B1.2(b). This yielded a level of 26, for which the range, given Gomez's criminal history category of I, was 63-78 months. Further, in reliance on *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), the district judge granted a downward departure of 10% of the sentence (i.e., six months), on the

---

[2] The district court relied, and so do we, on the Guidelines manual that became effective Nov. 1, 1989.

13

ground that Gomez's status as a deportable alien would undeservedly increase the severity of her punishment. This reduction, he noted, was the "maximum as I read *Smith* that I can allow at this time based upon the length of the sentence."[3] This resulted in sentences of 57 months for each drug count, to be served concurrently, and the judge expressed his intent to "give the minimum sentence that's required by the guidelines in this case." Finally, the court added one month for the failure to appear, which by law had to run consecutively with the other sentences.

The district judge also considered a motion for a downward departure under 18 U.S.C. § 3553(b)(1) for factors not adequately taken into account by the Guidelines. See *Koon v. United States*, 518 U.S. 81, 92-96 (1996). One of several factors raised by Gomez was her vulnerability to abuse in prison. The district judge rejected this as a basis of departure, citing *United States v. Graham*, 83 F.3d 1466, 1480-81 (D.C. Cir. 1996), which held that a departure was warranted only in the case of "extreme vulnerability," which the district court found Gomez had not shown. Gomez raised several other factors, which the district judge discussed at some length and accepted as true: that she had a difficult childhood, "no formal education," a "strong employment history," no criminal history before or after the offenses of which she was convicted, a "fragile . . . emotional and mental state that has developed since her incarceration," and a "physical condition that's deteriorated" (including surgeries). He then asserted that the Guidelines barred him from considering these factors: "While it's tragic and sad, it does not

---

[3] The government did not contest the court's grant of a *Smith* departure below the five-year statutory minimum. See 21 U.S.C. § 841(b)(1)(B). Nor in this appeal has the government raised the issue of the statutory minimum with respect either to a *Smith* departure or to *Booker* discretion.

raise to a level that was not adequately considered by the guidelines." He explained that the Guidelines took account of the factors raised, "and I don't see any individual one or a combination thereof raising it to a level of taking it outside the guidelines." If *Booker*'s rendering the Guidelines discretionary means anything, it must give a district judge greater latitude on these issues than did *Koon*.

Throughout the hearing, the district judge focused almost exclusively on the hardship to Gomez. Despite the prosecutor's vigorous condemnation of Gomez's failure to accept responsibility, the district judge never mentioned this issue, except in passing, as a bar to a departure on that basis. Indeed, the only criticism that he made of Gomez was to note briefly that "the evidence was strong that you were engaged in a distribution scheme even though you had children with you in your home." The district judge said he would request that Gomez be sent to a prison where she could be near her family and receive proper medical care. Most pointedly, he "recognize[d]" that Gomez was "subject to deportation and would be separated from her family permanently if this [i.e., deportation] happens." Upon telling Gomez that she would likely be deported, he added, "I don't know any way to stop that." His concern for Gomez's hardship appears to have been his reason for stating that this was "a very difficult sentencing" and that "sentencings of this type are always very difficult."

To counter the inference that the district court's discretionary sentence would be lower, the government cites *In re Sealed Case*, 199 F.3d 488, 490-91 (D.C. Cir. 1999), where we observed that a sentencing court's expressions of a preference to give a sentence below the Guidelines range should not be read as demonstrating an unawareness of authority to depart from the Guidelines. But that, of course, is a quite

different inquiry from our present one--whether, if subject to the Guidelines only on a discretionary basis, the court would be reasonably likely to give a lower sentence.

The record as a whole--particularly the district judge's imposition of minimum sentences (with the minor exception of the one-month sentence for failure to appear), his references to the Guidelines' mandatory constraints (particularly as bars to downward departures), and his focus on the defendant's hardship to the near exclusion of her culpability--establishes a reasonable likelihood that he would have imposed a lower sentence had he known the Guidelines were not mandatory.

* * *

The challenged convictions are affirmed. The sentence is vacated and the case is remanded for resentencing.

*So ordered*.