# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 18, 2006     Decided December 1, 2006

No. 05-3022

UNITED STATES OF AMERICA,
APPELLEE

v.

MELVIN LAWRENCE,
APPELLANT

Consolidated with
05-3023

Appeals from the United States District Court
for the District of Columbia
(No. 03-00175-01)
(No. 03cr00092-01)

*David B. Smith*, appointed by the court, argued the cause and filed the briefs for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese, III*, *David B. Goodhand*, *Elana Tyrangiel*,

Assistant U.S. Attorneys. *Thomas J. Tourish, Jr.*, Assistant U.S. Attorney, entered an appearance.

Before: RANDOLPH and TATEL, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* RANDOLPH.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

RANDOLPH, *Circuit Judge*: In one trial (No. 03cr00092-01), a jury found Melvin Lawrence guilty of distributing five grams or more of cocaine base. In another trial (No. 03-00175-01), a jury convicted him of possessing with intent to distribute more than five grams of cocaine base, possessing firearms in furtherance of drug trafficking, and possessing firearms as a convicted felon. We consolidated Lawrence's appeals. There are two main issues. The first is whether the government presented enough evidence to prove that the drugs were crack cocaine or another smokable form of cocaine base, as our opinion in *United States v. Brisbane*, 367 F.3d 910 (D.C. Cir. 2004), requires for convictions under 21 U.S.C. § 841(b)(1)(B)(iii). The second is whether the district court erred in not granting Lawrence's motion for a judgment of acquittal on the possession charges in the second trial.

I.

On April 30, 2002, undercover officers of the Metropolitan Police Department purchased 21.1 grams of cocaine base from Lawrence in the vicinity of Oak and Center Streets, in northwest Washington, D.C. In the next month, they purchased drugs from Lawrence and his associates twice more. On March 4, 2003, a grand jury issued an indictment against Lawrence on three

counts of distributing cocaine base in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(iii).

On March 13, 2003, as part of the follow-up investigation, officers executed search warrants on two residences. The first, 1458 Ogden Street, N.W., belonged to Lawrence's parents; the search there turned up no drugs or weapons. At the other address, 3030 30th Street, S.E., apartment #304, Curtistine Johnson resided with her four sons, one of whom Lawrence fathered.

The police found drugs and guns in Johnson's apartment. The pocket of a woman's raincoat hanging in a closet near the front door contained sixty-one small plastic bags of cocaine base. In the master bedroom closet, there was a loaded .357-caliber handgun, an assault rifle, a bag of ammunition for the assault rifle, and empty plastic bags matching the ones in which the drugs in the front closet were packaged. On the floor of the master bedroom, the police discovered a basket they characterized as a "cocaine cooking kit." The basket held the necessary equipment and ingredients to convert powder cocaine into crack cocaine. Various items of men's clothing were in the apartment, including a distinctive "zoot suit" jacket in the master bedroom closet and a man's coat, with car keys in the pocket, hanging in the closet near the front door. There were photographs of Lawrence, including one showing him wearing the "zoot suit" jacket. The police also recovered a health insurance identification card bearing Lawrence's name, as well as more than ninety pieces of mail with Lawrence's name on them. At the time of the search, neither Lawrence nor Johnson was present.

On April 24, 2003, a grand jury indicted Lawrence and Johnson on two charges: possessing with intent to distribute five grams or more of cocaine base, *see* 21 U.S.C. § 841(a)(1),

(b)(1)(B)(iii), and possessing a firearm in furtherance of a drug trafficking offense, *see* 18 U.S.C. § 924(c)(1). The indictment also charged Lawrence alone with possessing a firearm as a convicted felon, *see id.* § 922(g)(1).

Lawrence's first trial was on the charges contained in the March 4th indictment. The jury convicted him of distributing five grams or more of cocaine base in the April 30, 2003, undercover sale, but could not reach a verdict on the charges arising from the later undercover sales. The district court deferred sentencing pending the outcome of Lawrence's trial on the charges contained in the April 24th indictment.

In his second trial, on charges contained in the April 24th indictment, Lawrence was tried with Johnson. At the close of the prosecution's case, both defendants filed motions for judgments of acquittal pursuant to FED. R. CRIM. P. 29(a). The court denied the motions. Lawrence's attorney then notified the court that Lawrence would not testify and that the only evidence he sought to introduce was a series of stipulations he and the government had negotiated. The government had requested a few minor changes to the wording of the stipulations, so they were not ready for submission at that time.

Johnson proceeded with her defense, consisting of two character witnesses and her testimony. After Johnson rested, the court admitted Lawrence's stipulations, which included the facts that his driver's license listed his parents' address and that no drugs or guns were found in the search of that residence. At the close of his case, Lawrence renewed his motion for a judgment of acquittal. The court denied the motion, and the jury found both defendants guilty on all counts charged.

5

II.

*Brisbane* held that to convict a defendant of violating 21 U.S.C. § 841(b)(1)(B)(iii) – the more stringent of two cocaine provisions, this one devoted to cocaine base – the government must prove not only that the substance at issue was cocaine base but also that it was in a smokable form (like crack). *See Brisbane*, 367 F.3d at 911. If the government fails to prove this, the defendant must receive the lighter sentence for the lesser included crime of violating § 841(b)(1)(B)(ii), which deals with "cocaine and its salts." *See United States v. Eli*, 379 F.3d 1016, 1020 (D.C. Cir. 2004). In Lawrence's co-defendant's separate appeal, we determined that, although the record contained "no evidence about the substance's smokability and no expert offered a specific conclusion that the drugs in question were crack," there was enough evidence to satisfy *Brisbane*. *United States v. Curtistine Johnson*, 437 F.3d 69, 75 (D.C. Cir. 2006). We reviewed Johnson's claim under a plain-error standard. To Lawrence that makes all the difference because he properly preserved the issue for appeal, which we will assume *arguendo* he did in both trials. Even so, the government presented enough evidence for a rational jury to find beyond a reasonable doubt that the drugs found in the woman's raincoat were a smokable form of cocaine base.

In Lawrence's first trial, the government produced evidence that the substance in question contained cocaine base, that at the time of purchase the drugs comprised "a large white rock substance," and that the sale of the drugs followed conventional practices for the sale of crack cocaine. In addition, the undercover officers who purchased the drugs from Lawrence testified that he provided these drugs in response to their requests to buy crack. When "the evidence consists of many features consistent with crack cocaine," *Curtistine Johnson*, 437 F.3d at 75, it is within a fact-finder's province to decide, even

without expert testimony, that the drugs were crack cocaine. *See id.* Viewing the evidence most favorably to the government, *see United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005), we therefore conclude that a rational trier of fact could reasonably have determined that the prosecution proved the smokability element of § 841(b)(1)(B)(iii) beyond a reasonable doubt. *See, e.g., United States v. Gomez*, 431 F.3d 818, 819 (D.C. Cir. 2005). In light of the evidence the government produced at Lawrence's second trial, all of which is recited in the opinion on Johnson's appeal, *Curtistine Johnson*, 437 F.3d at 75, and need not be repeated here, we reach the same conclusion.

## III.

With respect to his convictions for possessing the drugs and guns found at Johnson's apartment, Lawrence argues that the evidence was insufficient. If a rational trier of fact reasonably could have concluded that the prosecution proved the elements of the crime beyond a reasonable doubt, the evidence is sufficient to uphold the conviction. *See, e.g., Gomez*, 431 F.3d at 819. Possession may be actual or constructive. "Constructive possession requires evidence supporting the conclusion that the defendant had the ability to exercise knowing dominion and control over the items in question." *Dykes*, 406 F.3d at 721 (internal quotation marks omitted). Constructive possession of items found in a home may be imputed to the home's owner or tenant because "a jury is entitled to infer that a person exercises constructive possession over items found in his home." *Id.* (internal quotation marks omitted). If the defendant has a key to a residence he does not own or rent, the jury still may infer "that he was not just a casual visitor." *United States v. Staten*, 581 F.2d 878, 885 (D.C. Cir. 1978); *see also United States v. Dingle*, 114 F.3d 307, 311 (D.C. Cir. 1997).

If we considered the testimony of Lawrence's co-defendant, we would conclude that sufficient evidence supported his convictions. Johnson testified that Lawrence had a key to her apartment, and that he usually stayed there multiple nights each week, often arriving after she had gone to bed. She said that he kept clothing and other possessions there, and that he regularly received mail at her address.

Circuit precedent, however, precludes us from relying on Johnson's testimony and requires that we consider only the evidence presented in the government's case-in-chief. *United States v. Foster*, 783 F.2d 1082 (D.C. Cir. 1986) (en banc), held that when a defendant, after moving unsuccessfully for a judgment of acquittal at the close of the prosecution's case, puts on evidence in his defense, the defendant waives the opportunity to challenge the denial of his motion. If the defendant moves for a judgment of acquittal at the close of all the evidence, sufficiency claims must be evaluated in light of all the evidence, including any inculpatory evidence presented in the defense case. *See id.* at 1085; *see also United States v. Wahl*, 290 F.3d 370, 373 (D.C. Cir. 2002).

The *Foster* decision rejected dicta in *Cephus v. United States*, 324 F.2d 893 (D.C. Cir. 1963), with respect to prosecutions involving one defendant,[1] but preserved "the precise holding of the *Cephus* opinion itself – which . . . simply

---

[1] Years before *Cephus* the Supreme Court stated that "[b]y introducing evidence, the defendant waives his objections to the denial of his motion to acquit. His proof may lay the foundation for otherwise admissible evidence in the Government's initial presentation, or provide corroboration for essential elements of the Government's case." *United States v. Calderon*, 348 U.S. 160, 164 n.1 (1954) (internal citations omitted). *Cephus* treated the Court's statement as dicta. 324 F.2d at 895 n.14.

refused to extend the [waiver] rule to the situation where, after the defendant moving for acquittal declined to proceed with his own case, inculpatory evidence was introduced by one of his co-defendants." *Foster*, 783 F.2d at 1086.

*Cephus* rested on the theory that a defendant does not waive a challenge to the denial of his motion for judgment of acquittal when he is "forced" or coerced into presenting a case in response to a co-defendant's testimony incriminating him. In that situation, the *Cephus* court thought, "the Government will in effect have been able to use the coercive power of the co-defendant's testimony as part of its case-in-chief, even though the Government was prohibited from calling the co-defendant to testify for the prosecution." 324 F.2d at 898. If we followed *Cephus* alone, we would hold that under *Foster* Lawrence waived his right to challenge the denial of his acquittal motion. The testimony of his co-defendant did not coerce Lawrence into mounting a defense. We know this because the stipulations he introduced were agreed upon before Johnson testified; they were admitted after her testimony only because they had to be retyped; and they were not confined to rebutting the evidence she gave about his relationship to her apartment.

But there is a later decision on point, a decision the *Cephus* coercion theory cannot explain. In *United States v. Don Johnson*, 952 F.2d 1407, 1411 (D.C. Cir. 1992), the court stated that it was adhering to "the rationale of *Cephus*," but then went considerably further than the rationale could take it. The *Don Johnson* court held "that a co-defendant's subsequent inculpatory testimony may not be considered in ruling upon a motion for a judgment of acquittal made after the close of the government's case in chief, even if the defendant might be found, under *Foster*, to have waived his motion." *Id.* By its terms, *Cephus* applied only if a defendant was coerced into responding to his co-defendant's evidence and presented

evidence aimed at rebutting that evidence. 324 F.2d at 897. In contrast, *Don Johnson* entirely rules out consideration of co-defendant testimony in evaluating the sufficiency of the evidence against the defendant.

The *Don Johnson* court did not explain why it was taking this step, but we can be fairly sure that it was not because the co-defendant's evidence coerced Don Johnson into presenting a defense. At the close of the government's case, after the court denied Don Johnson's acquittal motion and before his co-defendant presented any evidence, Don Johnson told the court he would be taking the stand. 952 F.2d at 1409. Perhaps the *Don Johnson* court formulated its rule in recognition of the serious problems entailed in administering the *Cephus* rule. How does an appellate court determine whether a co-defendant's testimony motivated the defendant to put on a defense? The government's evidence often has its own "coercive" effect. *See, e.g., United States ex rel. Leak v. Follette*, 418 F.2d 1266, 1268 (2d Cir. 1969) (Friendly, J.). And under *Cephus* what does the court do when the defendant's evidence tends to rebut not only his co-defendant's incriminating testimony, but also the government's case-in-chief, as it did in *Don Johnson*? *See Don Johnson*, 952 F.2d at 1409.

*Cephus* gives rise to other problems as well. Suppose, as commonly occurs, the government puts on a rebuttal case in response to the defense. May the reviewing court consider the government's rebuttal evidence in evaluating the sufficiency of the evidence? Neither *Cephus* nor *Don Johnson* provides an answer. Or suppose the defendant takes the stand after his co-defendant testifies. In cross-examination, the defendant breaks down and all but confesses to the crime. After his conviction, he appeals, claiming that the prosecution's evidence was insufficient to meet its burden of proof. Under *Cephus* and *Don Johnson*, the appellate court may not consider the defendant's

confession in evaluating the sufficiency of the evidence of his guilt.[2]

Without *Don Johnson*, we would not hold that *Cephus* barred us from considering the testimony of Lawrence's co-defendant. With *Don Johnson*, we must exclude that testimony

---

[2] Before its geographic split, the Fifth Circuit adopted *Cephus*, *see United States v. Belt*, 574 F.2d 1234 (5th Cir. 1978), but both the Fifth and Eleventh Circuits have now cabined its consequences by holding that, if a defendant relies on a co-defendant's testimony in closing argument, this constitutes a waiver, allowing the court to consider all evidence, including that presented by the co-defendant. *See United States v. Martinez*, 96 F.3d 473, 476-77 (11th Cir. 1996) (per curiam); *United States v. Cardenas Alavarado*, 806 F.2d 566, 570 n.2 (5th Cir. 1986). We wonder why, if a co-defendant's testimony compelled the defendant to take the stand and attempt to rebut or put the best face on that testimony, the same compulsion would not carry forward to the closing argument of the defendant's counsel. In any event, the holding of *Don Johnson* – "a co-defendant's subsequent inculpatory testimony may not be considered in ruling upon a motion for a judgment of acquittal made after the close of the government's case in chief, *even if the defendant might be found . . . to have waived his motion*," 952 F.2d at 1411 (emphasis added) – does not leave room for the sort of analysis these two courts of appeals employed. It is therefore of no moment that in closing, Lawrence's counsel used Johnson's testimony more than a dozen times to argue for his acquittal.

The Tenth Circuit held that when a defendant presents evidence and thereby waives his original motion for a judgment of acquittal, that waiver applies not only to evidence he introduced but to all evidence introduced by co-defendants as well. *See United States v. Delgado-Uribe*, 363 F.3d 1077, 1083 (10th Cir. 2004). Here again the decision is at odds with *Cephus* and with *Don Johnson*. The dearth of analogous cases in the other courts of appeals suggests that few courts follow the rule of *Cephus* or *Don Johnson*.

and take into account only the evidence presented in the government's case-in-chief. We can see no principled ground for distinguishing *Don Johnson* from this case. "One three-judge panel," we have held, "does not have the authority to overrule another three-judge panel of the court." *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

Absent Johnson's testimony, the government case against Lawrence was thin, consisting only of the items found in Johnson's apartment: the men's clothing, the photographs of Lawrence, mail with his name on the envelope, and a District of Columbia health insurance identification card bearing his name. As to the ninety or more pieces of mail, the exhibits were only envelopes. Not all contained postmarks, and nearly all of those that did were dated 1997 and 1998. Lawrence's name was on each, but his address was redacted (he was in prison, a fact the jury did not learn). On some of the envelopes, the sender's name and return address were redacted; on others, the sender's name – Johnson – appeared but her return address was blocked out. There were two exceptions. The court admitted two envelopes postmarked within three months of the search: one stamped December 2002 and one stamped a few days before the search. The jury could not have known who sent the two envelopes; the name of the sender and the return address were redacted.[3] The jury also could not have known the address to which the envelopes were sent; Lawrence's name appeared, but the delivery address on the envelopes was also redacted. On cross-examination, an officer who conducted the search admitted that he could not recall whether the two envelopes had been opened when they were discovered.

---

[3] The district court knew that Lawrence's brother sent both pieces of mail.

Of the men's clothing recovered, the government connected only one piece to Lawrence – the distinctive "zoot suit" jacket found in the master bedroom closet. A photograph from the apartment showed Lawrence wearing the jacket, but the photograph was many years old. This leaves the identification card. The card does not have a photograph on it, and gives no clue about when it was issued, when it became effective, or when, if ever, it expired. The card did list Lawrence's name, his Social Security number, and his date of birth. The card's location on a table in the master bedroom – as opposed to in a drawer, for example – might suggest that someone placed it there for easy access, but that is somewhat of a stretch.

On the other side of the ledger, Lawrence's name did not appear on the lease, and no witness placed Lawrence within, going to, or leaving the apartment. The government must have had information connecting Lawrence to the apartment before the search – this is what supported the search warrant, *see Curtistine Johnson*, 437 F.3d at 71 – but it did not present any such evidence at trial. The fact that Lawrence was not present at the apartment when police executed the search warrant magnifies the importance of these evidentiary holes. The majority of our constructive possession cases involve individuals who disclaim any connection to a residence in which they were present when police seized contraband on the premises. *See, e.g.*, *Gomez*, 431 F.3d 818; *Dingle*, 114 F.3d 307; *Edelin*, 996 F.2d 1238; *United States v. Zeigler*, 994 F.2d 845 (D.C. Cir. 1993); *United States v. Morris*, 977 F.2d 617 (D.C. Cir. 1992); *Staten*, 581 F.2d 878.

Lawrence leans heavily on *United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991), in which we affirmed Sylvia Jenkins's convictions for conspiring to possess and possessing cocaine base with intent to distribute, and for knowingly and intentionally maintaining a place used for the manufacture,

storage, or distribution of illegal drugs. *Id.* at 1177. When undercover police officers purchased cocaine from Jenkins's co-defendant, he had them wait while he retrieved the drugs from a nearby house at 4368 Varnum Place. *Id.* Police executed a search warrant at the Varnum Place house shortly thereafter, discovering large quantities of cocaine, guns, ammunition, and crack-cocaine processing equipment. *Id.* Although the house was Jenkins's, she testified that the contraband did not belong to her and that she had no knowledge of its presence in her home – testimony the jury could have chosen not to credit. *Id.* at 1179. Viewing the evidence most favorably to the government, we held that the circumstantial evidence against Jenkins was "sufficient to sustain the verdict, although just barely." *Id.* Among that evidence, "the most prominent [was] that the house was hers and that she lived there." *Id.*

Lawrence points out that the evidence in the *Jenkins* case "was vastly stronger than here, yet the [c]ourt said it was 'just barely' sufficient." Br. of Appellant 50 n.30. We agree with this assessment. Unlike Jenkins, Lawrence never acknowledged living in Johnson's apartment, and there was no evidence to suggest that the apartment was "his." One may infer that Lawrence had been in the apartment in the past. But no reasonable juror could determine (based on the government's case-in-chief) whether Lawrence had been there recently, let alone that he had dominion and control over the guns and drugs found in the apartment. The evidence the government introduced did not create a sufficient inferential chain to allow a reasonable trier of fact to find guilt beyond a reasonable doubt.

For this reason, we must reverse Lawrence's convictions in the second trial. Absent sufficient evidence tying him to Johnson's apartment, the prosecution did not prove that he constructively possessed the drugs or the guns. And without such proof, all of his convictions in that trial – for possessing

with intent to distribute more than five grams of cocaine base, possessing firearms in furtherance of drug trafficking, and possessing a firearm as a convicted felon – must fall.

For the foregoing reasons, Lawrence's convictions in 03-00175-01 are reversed and his conviction in 03cr00092-01 is affirmed. The cases are remanded for resentencing.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring: I concur and write separately only to express my doubt that *Cephus v. United States*, 324 F.2d 893 (D.C. Cir. 1963), even as confined by our later *en banc*, *United States v. Foster*, 783 F.2d 1082 (D.C. Cir. 1986), would not require the result we reach today.

*Cephus* appears to express unequivocally a premise that the government should not be able to benefit from the co-defendant's testimony *in any way*, whether indirectly by invocation of defendant's own rebuttal to that testimony, or directly by invocation of that testimony itself (regardless of "waiver"). Consider, for example, the *Cephus* court's remark that "It is also clear that the defendant's own evidence, introduced in response to the co-defendant's testimony, does not waive the motion [for judgment of acquittal on the basis of the government's case-in-chief] if it adds nothing to the Government's case." 324 F.2d at 897. In other words, in that scenario, *Cephus* allows the defendant the benefit of appellate review of the motion for judgment of acquittal *without* regard to any blame-casting by the co-defendant.

*Foster*, of course, described *Cephus* as issuing a dictum, namely, that "objection to denial of a motion for judgment of acquittal made at the close of the government's case-in-chief is not waived by the defendant's proceeding with the presentation of his evidence, so that the validity of an ensuing conviction must be judged on the basis of the government's initial evidence alone." 783 F.2d at 1083. The *en banc* court rejected that proposition, *id.* at 1085, but declined to overrule "the precise holding of the *Cephus* opinion itself—which after delivering its influential dictum criticizing the waiver rule in the present context, simply refused to extend the [waiver] rule to the situation where, after the defendant moving for acquittal declined to proceed with his own case, inculpatory evidence was introduced by one of his co-defendants," *id.* at 1086. As

*Foster* didn't involve co-defendant testimony at all, the court had no occasion to address the consideration of a codefendant's testimony, whether accompanied by evidence from the defendant or not.

Discussion of whether our result here is driven only by *United States v. Don Johnson*, 952 F.2d 1407 (D.C. Cir. 1992), compare Maj. Op. at 8, or also by *Cephus*, may seem a pointless quibble. In the event, however, that the court should decide to modify its position by an *en banc*, it may prove important to address the exact scope of our existing precedents.