Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued February 20, 2004　　　　Decided May 11, 2004

No. 03-3057

UNITED STATES OF AMERICA,
APPELLEE

v.

GEORGE BRISBANE,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(02cr00315–01)

————

*Adam H. Kurland*, appointed by the court, argued the cause and filed the briefs for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. On the briefs were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *John R. Fisher*, *Barbara J. Valliere*, and *Mary B. McCord*, Assistant U.S. Attorneys.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: SENTELLE, RANDOLPH, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: This appeal from a criminal conviction exposes a problem in the provisions setting penalties for cocaine offenses. A jury found George Brisbane guilty of distributing five or more grams of "cocaine base," in violation of 21 U.S.C. § 841. Because of Brisbane's status as a career offender, the district court sentenced him to 360 months' imprisonment. Punishment for violating § 841 depends on the weight of drugs involved in the offense. A certain quantity of "cocaine base" will trigger much stiffer penalties than an equivalent quantity of "cocaine, its salts, optical and geometric isomers, and salts of isomers." *Compare* 21 U.S.C. § 841(b)(1)(A)(ii)(II) & (B)(ii)(II) ("subsection (ii)") *with* 21 U.S.C. § 841(b)(1)(A)(iii) & (B)(iii) ("subsection (iii)"). The problem is that, chemically, "cocaine" and "cocaine base" mean the same thing.

Cocaine is a naturally occurring alkaloid – that is, a base – found in the leaves of the coca plant.[1] The leaves typically undergo extensive processing before reaching the United States. Processors shred the leaves and mash them with a strong alkali (like lime), a solvent (like kerosene), and sulfuric acid. The result is a light brown paste containing cocaine base (cocaine in its natural alkaloid form) and a number of other chemicals. The cocaine paste is processed with hydrochloric acid to create a salt, cocaine hydrochloride, a white or

---

[1] The following sources, from which we have drawn, provide scientific and technical information on cocaine: EDITH FAIRMAN COOPER, THE EMERGENCE OF CRACK COCAINE ABUSE (2002); Marian W. Fischman, *Coca Paste*, in ENCYCLOPEDIA OF DRUGS, ALCOHOL & ADDICTIVE BEHAVIOR 264 (2d ed., Rosalyn Carson–DeWitt ed., 2001) ("*Drug Encyclopedia*"); Marian W. Fischman, *Coca Plant*, in *Drug Encyclopedia* at 265; Marian W. Fischman, *Cocaine*, in *Drug Encyclopedia* at 267; PAUL M. GAHLINGER, ILLEGAL DRUGS: A COMPLETE GUIDE TO THEIR HISTORY, CHEMISTRY, USE AND ABUSE 239–61 (4th ed. 2004); THOMAS NORDEGREN, THE A–Z ENCYCLOPEDIA OF ALCOHOL AND DRUG ABUSE 180–85 (2002); United States Sentencing Commission, COCAINE AND FEDERAL SENTENCING POLICY (2002).

off-white powder. It is usually this powder that is shipped to the United States, where it is known colloquially as "cocaine."

Users generally consume powdered cocaine by snorting it. Since cocaine hydrochloride is water soluble, the nasal mucous membranes absorb the chemical, allowing it to enter the blood stream and eventually reach the brain. Users can also apply the powder to other mucous membranes, or dissolve it in water and inject it intravenously. But they cannot smoke it. The temperature at which cocaine hydrochloride evaporates is higher than the temperature at which its active ingredient breaks down.

Cocaine base, on the other hand, can be smoked. The ability to smoke the drug is important because smoking produces a quicker, shorter, and more intense high than snorting. This makes it much more addictive. Smoking cocaine paste, which contains cocaine base, is common in the Andes but rare in the United States because cocaine is generally imported in its powdered, nonsmokable form.

Beginning in the early 1970s, American drug dealers developed several methods to free cocaine base from cocaine hydrochloride so that it could be smoked. The most common method used to produce this "freebase" cocaine involved flammable substances and could result in dangerous explosions. This danger, along with the high price of cocaine, limited freebase's popularity.

In the mid–1980s, a new form of smokable cocaine became widely available. Known by the street name "rock" or "crack," this form was much easier to manufacture than other forms of freebase because the process did not involve volatile chemicals. Also, unlike the "traditional" method of making freebase, the "baking soda method" used to make crack did not remove impurities and adulterants present in the powder. These characteristics combined to produce a highly addictive form of smokable cocaine that was far cheaper than either powder or freebase had ever been. While cost had previously limited cocaine use to people of means, crack made it available to large numbers of young and low-income users.

Crack spread rapidly through several large cities. In 1986, Congress passed the Anti–Drug Abuse Act of 1986, Pub. L. No. 99–570, 100 Stat. 3207, without such normal deliberative processes as committee hearings and reports. *See* United States Sentencing Commission, Cocaine and Federal Sentencing Policy 5–6 (2002) ("*Sentencing Commission Report*"). Among other measures, the statute purported to impose much higher sentences for crack than for powdered cocaine. *Id.* at 4–5.

The statute established the quantities of "cocaine, its salts . . ." that would trigger various penalty tiers. But rather than describing crack by street name or manufacturing process, the statute established lower thresholds for any "mixture containing cocaine base." Because "cocaine" and "cocaine base" carry the same chemical meaning (the word "base" merely refers to the fact that cocaine is a base), the statute appears ambiguous, providing two different sets of penalties for the same offense. If the ambiguity remains unresolved, the rule of lenity would suggest imposition of the lower sentence. *See, e.g., United States v. Ray*, 21 F.3d 1134, 1140 (D.C. Cir. 1994).

Despite the fact that § 841 is the frequent subject of judicial opinions, the issue just identified has rarely arisen, for two reasons. The first is that the vast majority of cocaine base prosecutions involve crack. Whatever Congress meant by "cocaine base," there can be no doubt that it meant to include crack. *United States v. Brown*, 859 F.2d 974, 976 (D.C. Cir. 1988). Second, the Sentencing Guidelines define "cocaine base" as meaning only crack, and apply the lower penalties to other forms of cocaine base. U.S.S.G. § 2D1.1(c)(D). In most cases involving cocaine base that is not crack, the ambiguity therefore has no practical consequence.

Brisbane's case is different. After the government rested, Brisbane moved for a judgment of acquittal, arguing that the government had not proven the substance was crack as alleged in the indictment. (The indictment alleged that he distributed "cocaine base, also known as crack.") The gov-

ernment's expert witness, a forensic chemist, testified that the substance was 49 percent cocaine base, but she had done no tests to determine whether it was crack and could not say that it was. The district court ruled that the government had failed to prove that the substance was crack, a ruling it later characterized as a partial judgment of acquittal. But the court ruled that the government had offered enough evidence to support a guilty verdict for distribution of "cocaine base," rejecting the defendant's argument that "cocaine base" as used in § 841 meant crack only.

Had Brisbane been sentenced under the drug sentencing guidelines, he would have received the lower sentence for distribution of "cocaine." But Brisbane is a career offender. The career offender guidelines determine the sentencing range by reference to the statutory maximum sentence for the offense of conviction. *See* U.S.S.G. § 4B1.1. The district court calculated Brisbane's sentence using 21 U.S.C. § 841(b)(1)(B)(iii), which provides for a maximum life sentence for defendants with prior drug offenses convicted of distributing five or more grams of "cocaine base." To determine whether the evidence presented at Brisbane's trial was sufficient to support his conviction, we therefore must confront the ambiguity in § 841.

Four of the courts of appeals to consider this issue read "cocaine base" to include all base forms of cocaine and "cocaine, its salts . . ." to mean only cocaine hydrochloride. *See United States v. Barbosa*, 271 F.3d 438, 461–67 (3d Cir. 2001); *United States v. Butler*, 988 F.2d 537, 542–43 (5th Cir. 1993); *United States v. Jackson*, 968 F.2d 158, 161–63 (2d Cir. 1992); *United States v. Easter*, 981 F.2d 1549, 1558 (10th Cir. 1992). Similar statements appear in dicta in this court's opinion in *Brown,* 859 F.2d at 975–76. As a purely textual matter, this interpretation is far from convincing. Since cocaine hydrochloride is a salt, it is covered by subsection (ii)'s reference to "its salts." Unless the word "cocaine" in subsection (ii) has no meaning of its own, it must refer to cocaine in its natural form – cocaine base. If the words in subsection (ii) carry their ordinary scientific meaning, the statute is unquestionably ambiguous.

As we have said, the rule of lenity suggests that we should resolve ambiguities in a defendant's favor. But before we may apply that doctrine, we must examine the statute's "structure, legislative history, and motivating policies." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (citations omitted). There is much evidence that Congress intended "cocaine base" to mean something different from "cocaine" – it was targeting crack. *See United States v. Edwards*, 98 F.3d 1364, 1369 (D.C. Cir. 1996); *Brown*, 859 F.2d at 976; *Sentencing Commission Report* at 4–5 & n.17; Cooper, *supra* note 1, at 60–62. The legislative debates suggest that at least some members of Congress had in mind two characteristics that distinguished crack from older forms of cocaine. First, unlike powdered cocaine, crack could be smoked, making it more potent and addictive. *See, e.g., Sentencing Commission Report* at 9–10. Second, crack's low cost and ease of manufacture made it more widely available than other forms of smokable cocaine, especially among the nation's youth. *See, e.g., United States v. Booker*, 70 F.3d 488, 494 n.21 (7th Cir. 1995); *Sentencing Commission Report* at 9–10.[2]

In this light, a "literal" approach to interpreting "cocaine base" would be problematic. Congress could hardly have intended to apply the enhanced penalties to forms of cocaine base that are not smokable or even consumable without further processing, while imposing the lesser penalties on defendants dealing in similar amounts of ready-to-snort cocaine hydrochloride. *United States v. Lopez–Gil*, 965 F.2d 1124 (1st Cir. 1992), illustrates the point. The defendant was arrested with cocaine base secreted within the fibers of his suitcase. He was using this "mixture containing cocaine base" only for transport; the substance could not be consumed without further processing. *Id.* at 1132 (Brown, J., concurring and dissenting in part). Nevertheless, under a "literal" approach, the defendant would receive a far higher

---

[2] The *Sentencing Commission Report* lists five congressional purposes for targeting crack for harsher treatment, but they all amount to some version of these two important ones. *See Sentencing Commission Report* at 9–10.

sentence than if he had been caught with powdered cocaine ready for retail distribution.[3]  *See also Butler*, 988 F.2d at 542 (cocaine base "soft, mushy, and a bit wet"); *United States v. Munoz–Realpe*, 21 F.3d 375, 376 (11th Cir. 1994) (cocaine base "in liquid form").

In light of these unusual circumstances we therefore reject the "literal" approach.  There are two other options.  First, "cocaine base" could mean only crack.  By focusing on the only form of cocaine that is both smokable and widely available, this approach comes closest to matching what appears to be the purpose of the statute.  It also aligns the statutory definition with the guidelines definition, eliminating the potential for gross disparities between the guidelines range and both mandatory minimums and career offender sentences.  But this approach may be too narrow.  At this point, crack appears to be the only form of smokable cocaine that is cheap and easy to manufacture.  Yet as the development of crack itself demonstrates, it is hazardous to predict what this illicit "industry" will come up with next.  It may be that tomorrow someone will invent a method of preparing smokable cocaine to replace the "baking soda method" used to prepare crack.  *See Lopez–Gil*, 965 F.2d at 1134–35 (on rehearing).  Given the statute's use of the broad term "cocaine base," it is unlikely Congress intended to limit the enhanced penalty provisions to one manufacturing method.

The second option is that "cocaine base" means any cocaine that is smokable.  This is the approach the Ninth Circuit took in *United States v. Shaw*, 936 F.2d 412 (1991).  In addition to crack, it includes in the definition "traditional" freebase cocaine and cocaine paste.[4]  The Ninth Circuit's approach

---

[3] The *Lopez-Gil* court originally ruled that "cocaine base" meant only crack, vacating the defendant's sentence.  965 F.2d at 1130–31.  The court reversed itself on rehearing.  *Id.* at 1134–35 (on rehearing).

[4] It is true that cocaine paste may be made into cocaine powder, and that a defendant caught just before the conversion would receive a higher penalty under the Ninth Circuit's approach.  This difference comports with what we perceive to have been Congress'

avoids the difficulties inherent in the "literal" approach while not unduly narrowing the operation of the statute. Also, there is no question that smokability was extremely important in distinguishing crack from powdered cocaine. But it is also fairly clear that smokability alone would not have made crack as compelling a legislative target. Wide availability was also critical in distinguishing crack from its chemical cousins. Smokable cocaine existed long before the mid–1980s. Yet before the advent of crack, Congress did not punish it more severely than powdered cocaine. Congress also has never distinguished between snorting cocaine hydrochloride and injecting it, even though injection produces the same short, intense, and addictive high as smoking cocaine base. This is probably because the potential market for these drug-taking methods is limited. Traditional freebase (smokable) cocaine is dangerous to manufacture and, like powdered cocaine, extremely expensive; cocaine paste smoking never caught on in the United States; and there may be a social stigma against injecting drugs intravenously, even among drug users.

But we need not choose between the two options because both lead to the same result. Here the government did not prove that the substance distributed was smokable and it did not prove that it was crack.[5] Brisbane's conviction for violating § 841(b)(1)(B)(iii) therefore cannot stand.

There remains the issue of remedy. Distribution of "cocaine" is a lesser included offense of distribution of "cocaine base." The elements of the latter offense include all the elements of the former, plus proof that the type of cocaine is "cocaine base" within the meaning of subsection (iii). *See Kelly v. United States*, 370 F.2d 227, 228 (D.C. Cir. 1966). There is no doubt that the government's evidence sufficiently

---

intent. The defendant would be rendering cocaine paste into a form that Congress treated as less dangerous.

[5] The government argues that the chemist's testimony, along with other evidence, did prove the substance was crack. But the government cannot appeal the district court's partial judgment of acquittal. *See Sanabria v. United States*, 437 U.S. 54, 64 (1978).

supported Brisbane's conviction for distributing "cocaine," although the evidence did not support his conviction for distributing "cocaine base" as that term may be understood under either of the options discussed above.

A court of appeals "may . . . modify . . . any judgment . . . lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment . . . as may be just under the circumstances." 28 U.S.C. § 2106. We therefore have "the power to modify a criminal judgment to reduce the conviction to that of a lesser included offense, where the evidence fails to support one element of the crime of which appellant was charged and convicted but sufficiently sustains all the elements of the included offense." *Austin v. United States*, 382 F.2d 129, 142 (D.C. Cir. 1967). "[T]his power should be exercised only when it is clear that no undue prejudice will result to the accused." *Id.* There is no prejudice here. By convicting Brisbane of distributing "cocaine base," the jury necessarily concluded that the drugs involved were some form of cocaine. The jury's conclusion would not have changed even if the district court had given instructions directed at subsection (ii) instead of subsection (iii).[6]

---

[6] Brisbane has three other arguments for reversing his conviction, none of which are persuasive. He claims the district court erred in dismissing two jurors during the trial. The court found that one juror had prejudged an issue in Brisbane's favor, and that both had discussed the case in violation of the court's instructions and then lied to the court about doing so. In light of the district court's detailed explanations for its decision and its credibility findings, there was no abuse of discretion. *Compare United States v. Johnson*, 657 F.2d 604, 606 (4th Cir. 1981) (upholding similar dismissal), *with United States v. Donato*, 99 F.3d 426, 429 (D.C. Cir. 1996) (reversing when district court did not provide adequate explanation).

Brisbane argues the district court should not have considered his past attempt at a "walk-away" escape in determining his career offender status because such an escape is not a "crime of violence" under the sentencing guidelines. *See* U.S.S.G. § 4B1.2. But noth-

10

Accordingly, we vacate Brisbane's conviction for distributing "cocaine base" and remand the case to the district court with instructions to enter a judgment of conviction for distributing "cocaine" and to sentence accordingly.

*So ordered.*

ing in the record indicates the district court relied on the escape to determine whether Brisbane was a career offender.

Brisbane challenges the use of his two other convictions in sentencing, arguing that *Apprendi v. New Jersey*, 530 U.S. 224 (1998), required the government to allege the existence of the convictions in the indictment and to prove them to the jury beyond a reasonable doubt. The law is otherwise. *United States v. Webb*, 255 F.3d 890, 897–98 (D.C. Cir. 2001).