# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 13, 2005          Decided February 10, 2006

No. 04-3144

UNITED STATES OF AMERICA,
APPELLEE

v.

CURTISTINE JOHNSON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00175-02)

———

*Thomas J. Saunders*, appointed by the court, argued the cause and filed the brief for appellant.

*John P. Gidez*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, Assistant U.S. Attorney at the time the brief was filed, and *Roy W. McLeese III* and *Elana Tyrangiel*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, SENTELLE, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Curtistine Yvette Johnson was convicted of three crimes: unlawful possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(iii); using, carrying, and possessing a firearm in violation of 18 U.S.C. § 924(c)(1); and unlawful maintenance of premises to manufacture, distribute, store, and use a controlled substance during a drug trafficking offense in violation of 21 U.S.C. § 856(a)(2). Her conviction rested on evidence discovered by the police in a search of her apartment—some 5.5 grams of cocaine base packaged into 61 small plastic bags, cocaine cooking equipment, other drug paraphernalia, and guns. On appeal, she claims that the warrant for the search was invalid. She asserts primarily that some of the supporting evidence was old and that the warrant misspecified her address, locating the site in Washington's Northwest quadrant rather than, as it actually was, in the Southeast. Accordingly, she says, the district court erred in not suppressing the seized evidence. She also argues that her conviction for possession of cocaine base should be reversed because the government failed to prove that the substance seized was smokable cocaine base or crack cocaine; in the absence of such proof, we may not, under *United States v. Brisbane*, 367 F.3d 910 (D.C. Cir. 2004), uphold the higher penalties that § 841 prescribes for crimes involving "cocaine base." We reject both challenges.

* * *

The affidavit attached to the search warrant makes clear that the search's target was not Johnson but her co-defendant, Melvin Lawrence, who, it showed, had been involved in drug trafficking and had claimed to live much of the time at Johnson's address. Included in the March 12, 2003, affidavit's evidence of drug trafficking were incidents both old and new. The old ones involved three purchases of drugs from Lawrence by undercover officers, occurring between April and June 2002, each for more than $1,000 cash, and each for a tan rock substance that tested positive for cocaine. The most recent event was a chance encounter between one of the undercover officers and Lawrence at a gas station on February 4, 2003, a little more than a month before the affidavit. The affidavit recounts that Lawrence asked the officer for his cell phone number, and urged him to "come around the way and holla at me for some more shit."

There was nothing so recent to connect Lawrence to Johnson's apartment. The affidavit said that in an interview with the District of Columbia Pretrial Services Agency on March 26, 2002 (almost a year before the affidavit and search), Lawrence had given as his current addresses both his parents' home on Ogden Street in the Northwest quadrant and Johnson's apartment in the Southeast. The affidavit includes two other pieces of information linking Lawrence to Johnson's apartment, both undated: Lawrence called the undercover officer to cancel a sale from a cell phone registered to Y. Johnson ("Yvette" is Johnson's middle name) at the 30th Street address. And on more than one occasion, it said, investigators had observed Lawrence walking out of the 30th Street address.

The affidavit also offered expert evidence on dealers' practices. It said that narcotics traffickers frequently keep

various items related to trafficking in secure locations, "most often in the homes of the individuals involved in the organization," and that, in the expert's experience, "[i]t is not uncommon for those involved in illegal narcotics activity to use multiple residences and/or properties to elude detection."

In evaluating Johnson's objections to the district court's denials of her motion to suppress, we review the district court's findings of historical fact for clear error but review the district court's conclusions of law de novo. See *United States v. Thomas*, 429 F.3d 282, 285 (D.C. Cir. 2005) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Like the district court, we must accord "great deference" to the issuing official's determination of probable cause. See *Illinois v. Gates*, 462 U.S. 213, 236-237 (1983).

Johnson's weakest objection is her argument that the affidavit failed to connect Lawrence's criminal activity to Johnson's residence. In a case similarly without direct evidence of drug dealing or possession at the address to be searched, *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993), we found the affidavit sufficient, relying on expert testimony very like that provided here—that in the affiant's experience, "drug dealers frequently keep business records, narcotics, proceeds from sales, and firearms in their houses." *Id*. at 1254. Though the 30th Street dwelling wasn't Lawrence's sole dwelling, the affidavit showed it to be one of two.

More compelling is Johnson's claim that the evidence relied upon was stale. Everything else being equal, of course, dated information is less likely to show probable cause than fresh evidence. In *Schoeneman v. United States*, 317 F.2d 173 (D.C. Cir. 1963), we found a lack of probable cause on the date the search warrant was issued because of the "great delay" of 107 days in between the observations of criminal activity at issue (displaying classified documents describing the Navy's planned

purchases) and the application for a warrant. We objected to the absence of any updates: "There is no allegation that the books [containing the classified information] had not been moved in the intervening three and one-half months or, indeed, that the [defendant] himself had not moved." *Id*. at 177. More recently, in *United States v. Webb*, 255 F.3d 890 (D.C. Cir. 2001), 109 days passed in between the last controlled drug transaction between Webb and a government informant. When the informant attempted to purchase more drugs just 12 days before the swearing of the affidavit, Webb told him he didn't have any crack for sale. *Id*. at 892. We were troubled by the delay, and in the end didn't rule on the existence of probable cause but relied on *United States v. Leon*, 468 U.S. 897 (1984), which directs courts not to suppress evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Id*. at 922.

Most significantly for our purposes, our decision in *Webb* made clear that different kinds of information go stale at different rates. "[E]ven if Webb did not have drugs in his apartment at the time of the application, it would not necessarily have been unreasonable for an officer to conclude that a longtime drug dealer, whose most recent known deal had occurred three months earlier, would still retain papers permitting him to get back in touch with his customers or—as turned out to be the case—his supplier." 255 F.3d at 905. As records might well be retained even during a lull in sales, there was considerable prospect that such records would still be available in the defendant's dwelling even 109 days after his most recent known sale.

Thus we agree with the district court here "that greater lengths of time should be tolerated in assessing the staleness of information regarding a person's address, as opposed to their possession of contraband, because a person's address is often less fluid than a person's possession of incriminating evidence."

Mem. Op. (1/30/04) at 17 n.9. Whereas in *Webb* the most recent information on the suspect's drug activity was negative, here, four and a half weeks before the affidavit, Lawrence invited the agent to just "holla." As the information about drug dealing was fairly fresh, and the relatively old information related only to Lawrence's residence, we conclude that staleness didn't undermine the showing of probable cause.

Johnson's final objection to the warrant is its misspecification of her address. The warrant locates her apartment in the Northwest quadrant of Washington rather than the Southeast. While that was undoubtedly wrong, the warrant incorporated an affidavit that used the correct address four times but in one place substituted "Northwest" for "Southeast."

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched*, and the persons or things to be seized" (emphasis added). In evaluating whether a warrant satisfies the particularity requirement in spite of an error in the description of the place to be searched, nearly every other circuit court considers (1) whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and (2) whether there is any reasonable probability that another place might be searched mistakenly. See, e.g., *United States v. Mann*, 389 F.3d 869, 876 (9th Cir. 2004); *United States v. Lora-Solano*, 330 F.3d 1288, 1293 (10th Cir. 2003); *United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002); *United States v. Vega-Figueroa*, 234 F.3d 744, 756 (1st Cir. 2000); *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994); *United States v. Gilliam*, 975 F.2d 1050, 1055 (4th Cir. 1992); *United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984); *United States v. Avarello*, 592 F.2d 1339, 1344 (5th Cir. 1979). Where a warrant incorporates the supporting affidavit by reference, we read the description in the warrant in the light of

descriptions in the affidavit. *United States v. Vaughn*, 830 F.2d 1185, 1186 (D.C. Cir. 1987).

Neither of the relevant concerns is troubling here. A physical description of the building accompanied the street address on the affidavit. Furthermore, the district court found that two members of the search team, Officers Jackson and DiGirolamo, had been familiar with the 30th Street address for some time before the warrant was executed and thus knew that they were searching the correct location. Mem. Op. (1/30/04) at 8. Officer Jackson had observed Lawrence entering and leaving the building on several occasions. *Id*. at 7. Jackson also obtained keys to the building (but not to any apartment) from the building management company, and tested those keys to make sure the search team would be able to approach the apartment readily. *Id*. at 7-8. Finally, both officers testified that there was no "3030 30th Street" in the Northwest quadrant of D.C.

The situation is thus quite like that of *United States v. Occhipinti*, 998 F.2d 791 (10th Cir. 1993), where the warrant identified the premises to be searched as being in a particular area of "East Township 225 South, Section 36 of CO, KS," while in fact the intended site was in township "22 South." Upholding the search, the court relied on (1) the accuracy of the attached supporting affidavit (which gave the correct township number and also specified the county, which the warrant had omitted), (2) the non-existence of any township numbered "225 South" or "25 South," so that "a person serving the warrant would have further reason to seek the necessary clarification in the attached documents," *id*. at 799, and (3) the familiarity with the premises of the officer who had applied for and executed the warrant. All three features have their analogues here and assure us that the two risks that an address error may pose are absent. Contrast *Groh v. Ramirez*, 540 U.S. 551 (2004), where the portion of the warrant that was supposed to identify the items to be seized instead described the house to be searched, creating a

blatant facial gap that the affidavit, since it wasn't incorporated, did not correct.

* * *

Johnson challenges her conviction for possession of cocaine base, invoking *United States v. Brisbane*, 367 F.3d 910 (D.C. Cir. 2004), where we addressed an ambiguity in 21 U.S.C. § 841. That provision imposes higher penalties for drug crimes involving "cocaine base" than for those involving "cocaine, its salts, optical and geometric isomers, and salts of isomers." 367 F.3d at 911. We found the statute ambiguous because, as a chemical matter, "cocaine" and "cocaine base" mean the same thing. *Id*.

Looking to the legislative history, we found that two particular characteristics of crack cocaine motivated Congress to impose higher penalties on cocaine base. First, crack cocaine "could be smoked, making it more potent and addictive." *Id*. at 913. Second, its "low cost and ease of manufacture made it more widely available than other forms of smokable cocaine, especially among the nation's youth." *Id*. By reference to these criteria, we saw uncertainty for the classification of a third category of cocaine products—those which are smokable but are not crack cocaine—such as "'traditional' freebase cocaine and cocaine paste." *Id*. at 914. Because in *Brisbane* the government had proved neither that the drugs in question were crack nor that they were smokable, we were able to leave open the classification of smokable non-crack cocaine. Either way, we could uphold only a conviction for the lesser included offense of distributing cocaine. Here too we need not resolve the ambiguity, as the government adduced sufficient evidence that the substances involved were crack cocaine to meet the plain error standard. Because Johnson may have waived the claim completely by failing to renew her motion for acquittal at the

close of all the evidence, see *United States v. Sherod*, 960 F.2d 1075, 1077 (D.C. Cir. 1992), plain error is, of the possibly applicable standards of review, the one most favorable to her.

Plain error allows an appellate court to vacate the conviction for a new trial or to reverse outright where (1) there is error (2) that is plain and (3) that affects substantial rights, and (4) the court of appeals finds that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

In inquiring into plain error we assume in Johnson's favor that an error under *Brisbane* would qualify as "plain." In *Johnson v. United States*, 520 U.S. 461 (1997), the Court addressed the problem of law changing between trial and appeal. In order to relieve counsel of having to raise objections clearly precluded under existing law, the Court held that an error was plain if the "law at the time of trial was settled and clearly contrary to the law at the time of appeal." *Id*. at 468. Cf. *Olano*, 507 U.S. at 734 (declining to consider what law should govern in "the special case where the error was unclear at the time of trial but becomes clear on appeal because the applicable law has been clarified"). *Brisbane* was decided on May 11, 2004, more than a month after the end of Lawrence's trial. Before *Brisbane* there was no law affirmatively excusing the government from the obligation of proving that the cocaine at issue in the case was either crack cocaine or smokable, so we are presented with the "special case" left open by *Johnson* and *Olano*. Nonetheless, we assume arguendo that *Brisbane* defines the applicable requirement.

In *United States v. Eli*, 379 F.3d 1016 (D.C. Cir. 2004), a post-*Brisbane* case, we found the district court's conclusion that the drugs at issue were crack cocaine was well-supported and not clearly erroneous, *id*. at 1022, where:

> First, the government chemist testified, and Eli did not dispute, that Eli's drugs tested positive for cocaine base. Second, both the Drug Enforcement Agency's (DEA's) lab report and the U.S. Probation Office's Presentence Investigation Report (to which Eli acceded) stated that the drugs recovered in the sales were "rock-like." Third, the chemist indicated that the drugs were smokable. Finally, he concluded that the drugs were properly identified as crack cocaine

*Id*. at 1021 (citations omitted).

The evidence here is similar. As in *Eli*, a forensic chemist testified that the substance recovered from Johnson's apartment was cocaine base. (Moreover, the substance was 55% pure; *Eli* notes that the typical purity of crack cocaine is between 50% and 60%, 379 F.3d at 1021.). Second, as in *Eli*, officers testified that the recovered drugs were "rock" or "white rock," a physical description that reflects crack cocaine. Third, a law enforcement officer executing the search warrant testified that he found, inside a brown basket, a "cocaine cooking kit" consisting of Inositol, a dietary supplement that is a "fine powdery substance"; hospital masks; a glass pot and plate with white residue; a digital scale; a beater; and loose, empty, Ziploc bags that were one-quarter to one-half inch in diameter. A detective qualified as an expert in the distribution and use of narcotics explained in some detail how each of these items could be used to convert cocaine hydrochloride into "cocaine base or crack cocaine." Finally, the same expert testified that the quantity and packaging of the drugs found in Johnson's apartment—5.5 grams of cocaine packaged in 61 tiny Ziploc bags—were consistent with "the typical $10 ziploc bags of crack cocaine that's sold on the streets."

The case differs from *Eli* in that there was no evidence about the substance's smokability and no expert offered a

specific conclusion that the drugs in question were crack cocaine, although the forensic chemist did testify that the substance was *not* cocaine hydrochloride or powder cocaine. Besides that negative point, the evidence consists of many features consistent with crack cocaine—the purity and rocklike character of the drugs and the nature of the equipment and of the packaging. We do not know the frequency with which each of those features occurs with non-crack cocaine (if at all); but under plain error the burden is on the defendant to show the likelihood that the (supposed) error could have affected the outcome. See *Olano*, 507 U.S. at 734-35. Johnson has failed to show that such ambiguity as may remain was likely to have adversely affected the outcome of the trial.

The judgment of conviction is

*Affirmed*.