# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 4, 2007      Decided February 22, 2008

No. 05-3007

UNITED STATES OF AMERICA,
APPELLEE

v.

BERNARDO LLOYD,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00457-01)

---

*Neil H. Jaffee*, Assistant Federal Public Defender, argued the cause for the appellant. *A. J. Kramer*, Federal Public Defender, was on brief.

*Sarah T. Chasson*, Assistant United States Attorney, argued the cause for the appellee. *Jeffrey A. Taylor*, United States Attorney, and *Elizabeth Trosman* and *Roy W. McLeese III*, Assistant United States Attorneys, were on brief.

Before: HENDERSON, GARLAND and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Appellant Bernardo Lloyd was convicted of one count each of possessing

with intent to distribute five grams or more of cocaine base, possessing with intent to distribute cannabis, assault with a dangerous weapon and possessing a firearm during the commission of a crime of violence. Lloyd contends that all of his convictions should be reversed because the district judge delivered a coercive anti-deadlock charge and communicated with the jurors during their deliberations (including giving the challenged deadlock instruction) while Lloyd was absent from the courtroom. In addition, Lloyd challenges his conviction of possessing with intent to distribute more than five grams of cocaine base on the ground that the evidence was insufficient to establish that the substance he possessed was vaporizable cocaine base, known as "crack," rather than some other form of cocaine base. We affirm all of Lloyd's convictions because we conclude that the deadlock charge was not coercive, that conducting the proceedings in Lloyd's absence caused him no prejudice and that the evidence was sufficient to establish the seized substance was "crack" cocaine.

## I.

Viewing the evidence in the light most favorable to the Government as we must, *see United States v. Roy*, 473 F.3d 1232, 1233 (D.C. Cir. 2007), we find the record establishes the following facts.

Around noon on May 17, 2003, while driving a green Ford Expedition with his young daughter as passenger, Lloyd came upon a commercial tow truck belonging to Nemr Ibrahim stopped in the 1600 block of Levis Street N.E. in Washington, D.C., with the driver-side door open and blocking Lloyd's passage. Lloyd honked at Ibrahim, who was securing a disabled car to the tow truck. The driver of the disabled car responded by closing the tow truck door and Lloyd pulled alongside the tow truck and began to curse Ibrahim. Ibrahim approached Lloyd's vehicle and an argument ensued until Lloyd retrieved a handgun from the console area of his vehicle, pointed it toward Ibrahim's

face and threatened to shoot him in the head. Ibrahim then stepped away from Lloyd's vehicle and Lloyd drove off. Ibrahim called the police and reported the incident, along with Lloyd's license plate number.

Later the same day, police officers stopped Lloyd driving a green Expedition, with his daughter and her mother as passengers. The police explained that a "serious crime" had occurred in the Expedition and took the vehicle and its occupants to the Fifth District police station. Trial Tr. 231. Once there, the police impounded the vehicle but let Lloyd and his passengers depart. Afterward, Ibrahim was called in to inspect the vehicle and he identified it as the one in which Lloyd had drawn the gun on him. A few days later, Ibrahim identified Lloyd himself from a photo array.

Based on Ibrahim's identification, Metropolitan Police Department (MPD) Detective Dexter E. Martin obtained a search warrant for the Expedition. During the following vehicle search, he noticed the console cover between the front seats was loose. When he lifted it, he found a silver handgun and some ziplock bags containing "a white rock-like substance" and "a green weed substance," along with a scale, a knife and ski masks. Trial Tr. 151.

A grand jury indicted Lloyd on five counts: (1) unlawfully possessing with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); (2) unlawfully possessing with intent to distribute cannabis in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); (3) using, carrying and possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(i); (4) assault with a dangerous weapon in violation of D.C. Code § 22-402; and (5) possessing a firearm during the commission of a crime of violence in violation of D.C. Code § 22-4504(b). Appellant's App. (App.) 12.

Lloyd's trial began on September 8, 2004. To establish the contents of the seized ziplocks, the Government introduced a Drug Enforcement Agency (DEA) laboratory analysis, which identified the substances as 27.8 grams of 52% pure "[c]ocaine base" in eleven bags, 3.3 grams of 75% pure "[c]ocaine hydrochloride" in four bags and 32.3 grams of marijuana in twenty-five bags, App. 15, and which the parties stipulated was "true and accurate," Trial Tr. 162. In addition, MPD Sergeant John J. Brennan, who was qualified as an expert, testified on the distribution, packaging and use of crack cocaine in the District of Columbia and identified the white, rock-like substance in the ziplocks as "crack cocaine." *Id*. 194.

The jury began deliberating at 12:15 p.m. on September 9, 2004. Around 4:00 that afternoon, the jury sent a note to the judge, which note read:

> The jury is having difficulty determining some of the evidence. We are hung on Counts 1, 2, + 4. We are close but need some encouragement and instructions from the bench.

App. 16. It was dated "9-9-04" and signed by the jury foreman. The judge recalled the jurors and, at the foreman's request, instructed them further on "identification," that is, whether it was Lloyd who committed the crimes charged, and on the jurors' duty not to consider the nature of the crimes charged—for example, that they involved drugs and a gun. The judge then addressed the jury as follows:

> [Y]ou indicate in your message that you are hung on counts one, two, and four. You are close but need some encouragement and instructions. And certainly I'm here to provide encouragement; whether the additional instructions—whether my elaboration on the instructions is useful or not, I'll leave to you to decide.

But I think it might be useful for you to hear this additional instruction called partial verdict.

You do not have to reach unanimous agreement on all of the charges before returning a verdict on some of them. If you have reached unanimous agreement on some of the charges, you may return a verdict on those charges and then continue deliberating on the others.

Trial Tr. 290. The jury then resumed deliberating.

A short time later, the jury sent the judge a second note and asked to speak with him without counsel present. In response, the judge assembled both counsel and stated as follows:

I want the record to reflect that the clerk has in his hands a copy of the note that was handed to me from the jury. The note, which I will place under seal until this case is completed, begins something to the effect of, if possible, we would like to meet you in the courtroom without counsel or the Defendant being present. And then it goes on to say something to the fact [sic] like we are hung, and then he begins to spell out exactly how they are split on which counts.

I literally averted my eyes when I realized what I was about to read, and did not read what the splits are. I don't know what the splits are on what counts, did not finish reading the note, will not read the rest of the note, and believe that what I need to do is to call the jury back here, tell them that we are placing that note under seal and that I'm not reading it, tell them that it's inappropriate, that I really ought to rub their nose in the instruction. I don't think I could have been plainer about what I told them about not revealing their split. And tell them that if they have a question for me—well, I will tell them, A, that I will not meet them in the absence of counsel, but that if there's anything in

the rest of the note that I should know, I'll be happy to hear it, but that I cannot, will not know or hear anything about the way they're split. Any objection to what I've said so far?

Trial Tr. 293-94. He later re-emphasized that he had not read the actual numerical split: "[L]et the record be perfectly clear, I did not read, do not know what they told me, but the fact that they told me is of record, and the note will be under seal until we have a verdict or some other termination of this case."[1] *Id.* 295. Before the judge recalled the jury, Lloyd's counsel informed him: "Your Honor, for the record, Mr. Lloyd went downstairs and I'll waive his presence." *Id*.

The jury returned to the courtroom at 4:38 and the judge advised it as follows:

I called counsel in here pretty quickly after getting your last note, and Mr. Lloyd is downstairs getting a soft drink or something, and it's okay with me and it's okay with counsel if he not be here for this brief encounter. And it's going to be quite brief.

Members of the jury, we have a communication—what we have here is a failure of communication. I only read about the first two lines of the note that I was given from you, and then I literally closed it up and averted my eyes. Because the note says quite plainly how you're divided on issues, and I thought I made it pretty clear in the instruction that you are not to tell anybody how you're divided on anything until or unless we have a verdict.

---

[1]The note was apparently misplaced after being placed under seal and it is not a part of the record on appeal. *See* Appellant's Br. 15 n.3.

Now, if you think we're just sharing information between the judges of the facts and judges of the jury, I'm afraid it doesn't work that way. We cannot—I cannot have a conference with you out of the presence of counsel. We just can't do that. I mean, it's got to be—the lawyers on both sides have a stake in this and they have a right to be here.

And so I'm going to ask you either to—well, the answer to the question I did read was can we meet out of the presence of the lawyers, and the answer is, I'm afraid not. And then I stopped reading, and I literally stopped reading, closed it up, stopped reading, and we placed it under seal for the rest of the proceeding. Because I can't know that, I don't want to know it, I don't want to hear it. That's entirely secret, and for you to know and nobody else to know, until or unless you have a unanimous verdict or the case is terminated in some other way.

*Id*. 295-96. After an additional exchange with the jurors, the judge dismissed them and informed counsel he intended to give the jury a *Thomas* anti-deadlock charge—so named because we endorsed it for use in this Circuit in *United States v. Thomas*, 449 F.2d 1177 (D.C. Cir. 1971) (*en banc*)—and to reread his "function of the jury" and "reasonable doubt" instructions. Trial Tr. 301-02. He then recalled the jurors and instructed them as indicated. The deadlock instruction directed them as follows:

Now, please listen to this instruction. The verdict must represent the continued [sic] judgment of each juror. In order to return a verdict, it is necessary that each juror agree to the verdict; in other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must

decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

*Id*. 301. After giving these instructions, the judge released the jurors for the day.

The jury resumed deliberating the following morning and around 11:00 a.m. reported a unanimous verdict. It convicted Lloyd of Counts 1, 2, 4 and 5 and acquitted him of Count 3.

On December 21, 2004, the judge sentenced Lloyd to concurrent terms of 84 months on Count 1 and 60 months on each of Counts 2, 4 and 5, to be followed by four years of supervised release. *See* App. 19-21.

Lloyd filed a notice of appeal on January 3, 2005.

## II.

As noted *supra*, Lloyd asks the court to reverse (1) his conviction of Counts 1, 2, 4 and 5 based on the judge's communications with the deliberating jurors—both because the *Thomas* deadlock instruction had a coercive effect on the jurors and because the communications occurred while Lloyd was absent from the courtroom; and (2) his conviction of Count 1 because the evidence did not establish that the white substance in the ziplock bags retrieved from the console was "crack" cocaine. We address each argument *seriatim*.

### *A. Communications with the Jury*

First, Lloyd argues that the deadlock instruction was "impermissibly coercive" in light of the two jury notes and the judge's responses to them. "To reverse for coercion, a court must find that 'in its context and under all the circumstances the judge's statement had the coercive effect attributed to it.' " *United States v. Spann*, 997 F.2d 1513, 1516 (D.C. Cir. 1993) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965)). We conclude that the *Thomas* instruction the trial judge gave was not coercive so as to warrant reversal.

Juror coercion can occur "where the judge, in his communications to the jury, is unduly coercive," which typically arises when "the jury, having been unable to agree, is sent back by the judge for further deliberations" and "the judge's instruction in sending the jury back had a 'possibly coercive effect.' " *(Robert) Williams v. United States*, 419 F.2d 740, 750 (D.C. Cir. 1969) (en banc) (quoting *(Ronald) Williams*, 338 F.2d 530, 533 (D.C. Cir. 1964)) (Wright, J., dissenting in part and concurring in part). Plainly, that did not occur here. As Lloyd acknowledges, the deadlock instruction the district court gave conformed to the language of the model instruction endorsed by the American Bar Association (ABA), which we adopted in *Thomas* "as the vehicle for informing jurors of their responsibilities in situations wherein judges decide to do so."[2] 449 F.2d at 1187; *see* Reply Br. 4 n.2 ("[T]he government is correct that Mr. Lloyd does not dispute the language of the *Thomas* instruction . . . ."). In *Thomas*, we adopted the ABA language precisely because it is not coercive and its use would therefore eliminate "the volume and complexity of litigation generated by the *Allen* charge," which had theretofore been used

---

[2]The *Allen* charge was "[s]o named after receiving approbation by the Supreme Court in *Allen v. United States*, 164 U.S. 492 (1896)." *Thomas*, 449 F.2d at 1179 n.3 (parallel citation omitted).

in this Circuit. 449 F.2d at 1186; *see United States v. James*, 764 F.2d 885, 891 (D.C. Cir. 1985) (*Thomas* instruction "itself guards against a coerced jury verdict by cautioning that the jurors should reach a verdict only 'if [they] can do so without violence to individual judgment,' and jurors are not to surrender '[their] honest conviction[s] as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors, or for the mere purpose of returning a verdict' ") (quoting *Criminal Jury Instructions, District of Columbia*, No. 2.91 (3d ed. 1978) (alterations in *James*)). Because the instruction in this case conformed to the non-coercive *Thomas* language, it was not itself coercive. Nonetheless, Lloyd seeks reversal based on another type of juror coercion, "often entwined with the first," namely "when a jury returns unable to agree, and the numerical division of the jury is revealed in court." *(Robert) Williams*, 419 F.2d at 750 (citing *Brasfield v. United States*, 272 U.S. 448 (1926); *(Ronald) Williams v. United States*, *supra*)) (Wright, J., dissenting in part and concurring in part). We find this circumstance inapplicable as well.

At Lloyd's trial, the jurors' numerical division was not "revealed in court" nor even known to the judge. As the judge carefully explained to counsel and the jury, he stopped reading the second note before he reached the numerical division and therefore did not know what the division was or whether the jury was leaning toward conviction or acquittal. Thus, we do not face the "precarious" situation where the judge "give[s] a supplemental charge to consider each other's views when he was already advised that only [a minority of] jurors voted for acquittal." *Mullin v. United States*, 356 F.2d 368, 370 (D.C. Cir. 1966) (holding mistrial was properly declared after jury note revealed in court only 4 of 12 jurors favored acquittal); *cf. United States v. Daas*, 198 F.3d 1167, 1180 (9th Cir. 1999) ("There is no reason to believe the form of the instruction would have been perceived as coercive by jurors holding the minority view, particularly since the district court judge did not inquire as

to the numerical division and thus did not know whether the majority was in favor of conviction or acquittal.").[3]

Nor is this case like *Smith v. United States*, 542 A.2d 823 (D.C. 1988)—which Lloyd cites for "circumstances strikingly similar to those in the instant case." Appellant's Br. 20. In *Smith* the trial judge was unaware of the jury's numerical division, which was disclosed in two jury notes, because his law clerk screened the notes and kept the information from him. On appeal, however, the court reversed the conviction, concluding that "[t]he judge's attempt to avoid tainting the [deadlock] instruction by having his law clerk intercept the jury's notes was ineffectual *because he failed to let the jury know that he had not read the notes himself*." 542 A.2d at 825 (emphasis added). Here, by contrast, the judge repeatedly and emphatically informed the jurors he had not read and did not know their numerical split.

Lloyd also identifies other circumstances at trial that he claims rendered the deadlock charge coercive but we find none of them telling. He points, for example, to the first jury note, which informed the judge that the jury was "close" to a verdict on three counts but that it "need[ed] some encouragement and instructions from the bench," App. 16, and asserts that the judge's reference to these words in open court would have appeared coercive to the minority jurors. We are not persuaded.[4] After all, the first note here did not, as did the note

[3]Lloyd posits that the judge would have inferred that there were only one or two hold-outs, that those were holding out for acquittal and that it was therefore reasonable to believe that the dissenting jurors felt coerced based on the judge's hypothetical inferences. We cannot credit such speculative reasoning.

[4]What occurred here is not, as Lloyd asserts, "analogous to" what occurred in *(Ronald) Williams*, *supra*. Appellant's Br. 16. There, the

in *(Robert) Williams*, reveal the jurors' actual numerical split. Nor did the judge (unlike the *Smith* judge) respond to this note with a deadlock charge. Instead, he expanded upon his instructions, at the jury's specific request, and added a partial verdict instruction. It was not until after the second jury note, which specifically stated the jury was "hung" and requested that the jurors speak with the judge apart from counsel (and which went on to set out the unread numerical division), that the judge decided to give a deadlock instruction. Thus, the circumstances here are similar to those we faced in *United States v. Spann*, in which we found no ground for reversal—notwithstanding comments the trial judge made to the jury after a first deadlock note were "inappropriate and probably proscribed under *Thomas*"—because the improper comments "had no direct effect on the jury—that is, they did not break the jury deadlock or cause the guilty verdict." 997 F.2d at 1518. We there explained:

> When the jurors resumed deliberation on the third day they again reached deadlock, despite the judge's admonition of the previous evening. Thus, we do not see how any of the cited remarks could have, by themselves, coerced the jury to return the guilty verdict so as to warrant reversal. It was only after the judge delivered the supplemental charge in response to the second deadlock note that the jury finally reached a unanimous verdict.

---

jury foremen wrote a note asking "[c]an the (two) alternate jurors replace the minority voters?" and, when questioned by the judge, disclosed that the jury was divided by "a clear minority," 338 F.2d at 531. Thus, unlike here, the judge there knew the jury's numerical division and the jurors were aware that he knew. Further, there we found that the formulation of the *Allen* charge the court gave was itself "unquestionably . . . impermissible," *id*. at 533, while the language of the *Thomas* charge here was, as we have explained, unobjectionable.

*Id*. (citation omitted). Here too, the jurors resumed deliberating after the first jury note and remained unable to reach a verdict. After the jury sent the second note, the judge gave the *Thomas* instruction and recessed court for the day. The jurors did not resume deliberating and reach a unanimous verdict until the next day. We therefore see no causal nexus between the exchange following the first note, even if objectionable, and the jury's ultimate verdict. *Cf. Thomas*, 449 F.2d at 1181 n.19 (noting court previously rejected claim of coercion where overnight recess between supplemental deadlock charge and resumption of deliberations was "less coercive on the jury than a charge immediately followed by sequestration and deliberation") (citing *Fulwood v. United States*, 369 F.2d 960, 962-63 (D.C. Cir. 1966)).

Finally, Lloyd asserts that the district court violated his right under Federal Rule of Criminal Procedure 43 and the Fifth and Sixth Amendments to the United States Constitution to be present when the judge discussed the second jury note with counsel and then communicated with the jurors (with counsel present), and in particular, when he gave the anti-deadlock instruction. Assuming that Lloyd had such a right and that he did not waive it—issues we do not reach—we conclude that any violation of the right was harmless.[5]

---

[5]In a letter submitted after oral argument pursuant to Federal Rule of Appellate Procedure 28(j), the Government cited as relevant to the waiver issue our recent decision in *United States v. Hoover-Hankerson*, 511 F.3d 164 (D.C. Cir. 2007), in which we held that the defendant had waived through counsel her Sixth Amendment right to be present during voir dire. We find *Hoover-Hankerson* distinguishable because the defendant there was aware the proceedings would continue in her absence and was in the courtroom when her counsel orally waived her continuing presence on her behalf. *See* 511 F.3d at 169. In contrast, Lloyd was not present when his counsel purported to waive his presence and could not have known there

Ordinarily, we review for harmlessness under the standard set out in *Kotteakos v. United States*, 328 U.S. 750 (1946), and determine whether it is "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." 328 U.S. at 776. Lloyd argues, however, that because he raises a constitutional challenge, we must apply a stricter standard, namely whether continuing the trial proceedings in Lloyd's absence was "harmless beyond a reasonable doubt." Appellant's Br. 29-30 (citing *Chapman v. Cal.*, 386 U.S. 18, 21-22 (1967); *United States v. Washington*, 705 F.2d 489, 498 (D.C. Cir. 1983); *Wade v. United States*, 441 F.2d 1046, 1050 (D.C. Cir. 1971)). We need not choose between the two standards as the alleged error in conducting the proceedings in Lloyd's absence was harmless under either one. *Cf. United States v. Tchibassa*, 452 F.3d 918, 929 (D.C. Cir. 2006) (given "overwhelming evidence" of guilt, "any error in the district court's evidentiary rulings, whether or not of constitutional dimension, was harmless"). Any error was harmless because there was not " 'any reasonable possibility of prejudice' " to Lloyd as a result of the proceedings continuing in his absence. *Wade*, 441 F.2d at 1050 (where trial judge erred in repeating jury instructions and giving *Allen* charge in defendant's absence, "[t]he standard by which to determine whether reversible error occurred . . . is . . . whether there is 'any reasonable possibility of prejudice' " (quoting *Walker v. United States*, 322 F.2d 434, 436 (D.C. Cir. 1963), *cert. denied*, 375 U.S. 976 (1964)). The only significant event Lloyd missed was the discussion with counsel about the anti-deadlock instruction and the judge's subsequent giving thereof. Because the charge involved a complex legal issue, it is unlikely Lloyd would have contributed greatly to the debate. Moreover, Lloyd's counsel did not stand mute in Lloyd's absence; in fact, he argued with

would be a second jury note or additional exchanges between the judge and the jury during his absence.

the judge about which instruction to use. Finally, as noted, there was nothing erroneous in the anti-deadlock charge. For these reasons, we conclude that any error in proceeding in Lloyd's absence was harmless. *See United States v. Rodriguez*, 67 F.3d 1312, 1316 (7th Cir. 1995) ("[F]ailure to secure the defendant's presence is harmless if the issue is not one on which counsel would be likely to consult the defendant, or if it is not one for which the defendant, if consulted, would be likely to have an answer that would sway the judge.").

Although we have found no ground under the circumstances of this case to reverse Lloyd's conviction based on the deadlock instruction or the judge's other communications with the jury in Lloyd's absence, we nonetheless caution the district court against expanding on the *Thomas* script after a jury indicates deadlock. *See* Trial Tr. 296 (elaborating on roles of court, jurors and lawyers). In prescribing the *Thomas* instruction for use in this Circuit, we decried " 'the large amount of litigation which the use of the original *Allen* charge has engendered,' " noting in particular that " '[o]ne of the sources of trouble on appeal has been that the language actually used tends to vary from judge to judge, and this lack of uniformity in a delicate context is full of pitfalls.' " 449 F.2d at 1185 (quoting *United States v. Johnson*, 432 F.2d 626, 632 (D.C. Cir. 1970) (alteration in original)). We left no room in *Thomas* for judicial innovation or extemporizing after deadlock and a trial judge does so at peril of reversal. It is essential that each trial judge hew to the precise language we adopted in *Thomas*—and stop there—to insure against even the suggestion of juror coercion.

### B. Sufficiency of "Crack" Evidence

Lloyd also challenges the sufficiency of the trial evidence to establish that the substance in the seized ziplocks was "crack" cocaine, that is, smokable or vaporizable cocaine base. Following our recent decision in *United States v. Powell*, 503 F.3d 147 (D.C. Cir. 2007), we reject this argument as well.

In *Powell*, a DEA forensic chemist testified that the substance in the ziplock bags seized from the defendant was 83% pure "cocaine base" and his written report to this effect was admitted into evidence. In addition, the two arresting officers testified they had seen "crack" many times and the substance seized was crack cocaine. Finally, Sergeant Brennan, qualified as an expert in that case as well, testified from a photograph that the substance was "crack." The court concluded that the evidence, "[w]hile not exactly overwhelming, . . . was enough to enable a rational trier of fact to determine that [the substance] was crack cocaine." 503 F.3d at 149. The court explained: "The arresting officers had ample experience with crack cocaine. Their identification of Powell's material as crack cocaine was not contradicted. Nor was Sergeant Brennan's expert testimony on the subject." *Id*. In this case, the evidence is likewise adequate. The chemist's report, entered into evidence, identified the substance seized from the console as 52% pure "[c]ocaine base," App. 15, and Lloyd stipulated the report was "true and accurate," Trial Tr. 162. In addition, Brennan, again without contradiction, positively identified the "white substance" in the ziplocks as "crack cocaine" based on his experience and expertise. Trial Tr. 194; *see also id*. 197 ("Exhibit Number 1 is 28.5 grams. It's 11 Ziplock bags, and it contains cocaine base, crack cocaine."). *Id*. 197. Examining a photograph of the drugs, Brennan testified that their rock-like form looked like crack. *Id*. 195. Detective Martin, who recovered the substance, also identified it as "white" and "rock-like." *Id*. 151. Brennan further testified that, given the customary practices of packaging crack cocaine for sale in the District of Columbia, the "crack cocaine" was "basically packaged for the wholesale street distribution." *Id*. 197. Finally, he explained that the knife found in the console "could be used for protection in the drug trade or could be used to break up the cocaine base, break up the rocks" and that "[t]he scale is used to measure the amounts" in packaging crack cocaine for wholesale distribution. *Id*. at 198.

Lloyd asserts that Brennan's testimony "demonstrated a lack of precision regarding the critical distinction recognized in [*United States v. Brisbane*, 367 F.3d 910 (D.C. Cir. 2004)] between cocaine base generally and the particular form of cocaine base known as crack" because Brennan testified that "crack is a 'street name' for the same drug that chemists identify as 'cocaine base' " and "did not testify that the particular substance seized in this case was smokable." Appellant's Br. 35 (citing Trial Tr. 195-96). Nonetheless, Brennan was correct in identifying "crack" as the street name for the form of cocaine base commonly distributed in Washington, DC since the 1980s. *See United States v. Brisbane*, 367 F.3d at 911-12 (D.C. Cir. 2004). Moreover, while one of the distinctive characteristics of "crack" is that it can be vaporized and therefore smoked without losing its narcotic effect,[6] the absence of expert testimony on vaporizability "d[oes] not undermine the force" of the other evidence that the seized substance is crack cocaine. *Powell*, 503 F.3d at 149. As in *Powell*, we "cannot say that no rational juror could have found beyond a reasonable doubt"—based on the DEA analysis and Brennan's testimony—"that [Lloyd] possessed crack cocaine." *Id*.

For the foregoing reasons, we affirm the judgment convicting Lloyd of Counts 1, 2, 4 and 5 of the superseding indictment.

*So ordered*.

---

[6]Vaporized cocaine in *powder* form is "pharmacologically inactive." *Powell*, 503 F.3d at 149 n.2 (citing United States Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 12-13 (Feb.1995) (*Special Report*)). But cocaine base, and specifically crack cocaine, vaporizes at a lower temperature so that "[t]he fumes from vaporized cocaine base still contain the active cocaine molecule and inhaling the fumes"—as through smoking—"will produce a high." *Id*. (citing *Special Report* 12-13).